MAIRS et al. v. MAYOR, ETC., OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. June 8, 1900.)

1. CITY—PUBLIC WORK—CONTRACTOR—UNFORESEEN OBSTACLES—DAMAGES.
   Plaintiff contracted with a city to build a crib fender for a drawbridge, on the bottom of a bay. In advertising for bids, the city notified all bidders that, though soundings and estimates had been made, bidders must satisfy themselves of their accuracy. The contract provided that all loss arising from the nature of the work or from unforeseen obstructions should be sustained by the contractor. After proceeding with the work for some time, the contractor discovered that there was a water pipe on the bottom of the bay, where the crib fender was to rest, and of which no map or specification was recorded. *Held*, that the obstruction encountered was within the terms of the contract, and the city was not liable for extra cost caused the contractor by reason thereof.

2. SAME—WAIVER.
   A contractor, in building a crib fender for a drawbridge, to rest on the bottom of a bay, encountered a water pipe, of the existence of which the city, for whom the work was being done, gave the contractor no notice, whereby he was delayed for a number of days in the completion of his work. The contract provided that he should sustain any loss caused by unforeseen obstructions. *Held*, that a waiver by the city of liquidated damages for the delay, which it might have charged the contractor, was not an admission that it was responsible for the delay caused by such water pipe.
   Patterson, P. J., dissenting.

Appeal from trial term, New York county.

Action by Charles F. Mairs and another against the mayor, aldermen, and commonalty of the city of New York, to recover extra compensation and damages on a contract for public work. From a judgment in favor of plaintiffs (62 N. Y. Supp. 351), defendant appeals. Reversed.

Argued before PATTERSON, P. J., and RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Theodore Connoly, for appellant.
L. Laflin Kellogg, for respondents.

RUMSEY, J. On the 24th of October, 1896, Mairs made a contract with the city of New York to build and place a crib fender for the Pelham River Drawbridge in Pelham Bay Park. The work consisted of placing a crib fender in a branch of Pelham Bay, so that the ends

of the drawbridge spanning the branch could rest upon it when the bridge was opened. To accomplish that purpose, it was necessary that the fender should rest upon the bottom of the bay, and there be fixed in such a way that it would be firm and immovable. Mairs began work shortly after the contract was signed; and continued it until the 15th of December, 1896, when it was discovered for the first time that a water pipe of the New York & Westchester Water Company lay upon the bottom of the bay, in such a position that, if the fender was placed according to the specifications, it would rest upon the pipe, and would be likely to break it. Upon discovering that fact, Mairs gave notice to the park department, which was in charge of the work, and negotiations were had from time to time between him and the water company and the park department, so that the work was delayed 43 days before arrangements were finally completed by which the fender could be placed. During those 43 days Mairs had present barges loaded with stone and other material necessary for the work, and he also retained in his employment the men he had hired for that purpose. He brought this action to recover the damages which he had suffered by being prevented from doing the work, and being compelled to pay demurrage and the wages of his men during the time he was unable to proceed with the work. At the close of the trial the learned trial justice directed a verdict for the plaintiff, upon which judgment was entered, and from that judgment this appeal is taken.

The plaintiff claims that the defendant was liable for the increased expense to which the contractor was put because of this delay, for the reason that it had permitted the pipe of the water company to be located in the place where the fender was to be put, and that it was aware of its location, and failed either to remove the pipe, or to change the specifications in such a way that the contractor could go on with his work. The defendant, on the contrary, claims that the plaintiff, under the terms of the contract, took the risk of the existence of the pipe, and of any other obstruction or incumbrance upon the bottom of the stream, and that it was his duty to ascertain its existence, and, as he failed to do so, he cannot now hold the defendant liable for the damages which resulted.

The contract was made upon the usual estimates and specifications. The advertisement for estimates provided that the bidders must satisfy themselves, by personal examination of the location of the proposed work, as to the accuracy of the engineer's estimate. It was provided in the specifications that the soundings shown on the plans had been made with thoroughness and care, and were believed to be correct, but that the contractor must satisfy himself of their accuracy, as the park department would not be responsible for any discrepancy between those shown on the plans and any others which might be made. The specifications further provided that:

"All loss or damage arising out of the nature of the work to be done under this agreement, or from any unforeseen obstructions or difficulties which may be encountered in the prosecution of the same, * * * or from incumbrances on the line of the work, * * * shall be sustained by said contractor."

It appeared that on the 24th day of July, 1891, permission had been given by the park board to place this water pipe through Pelham Bay

Park, across the bay, "at or near the bridge, and continuing south along the line of the Pelham Rd." It was directed that the laying of the pipe should be done under the superintendent of engineers, and the supervision of an inspector to be appointed by the park department, to be paid by the water company. While there is no evidence as to just what was done under this license, it is to be assumed, of course, that the work, in a general way, was completed under the supervision of the superintendent of engineers of the city, and the inspector appointed for that purpose. But it does not appear, nor do I think it is fairly to be inferred from anything in the case, that the park department had, or ought to have had, knowledge of the precise place where the pipe had been laid, or the situation it occupied with reference to the fender which was to be built by Mairs. The license did not establish any particular location for the pipe, but it was general in its terms, in permitting it to be laid across Pelham Bay "at or near the bridge," and it did not specify any more particular location; nor was there any rule that the precise spot on the bottom where the pipe was laid was to be shown on any map in the archives of the park department; nor was there any reason why, so far as I can discover, the park department should have been expected to know of the precise location where this pipe was sunk, or to have any more exact knowledge on that point than any one else. Just where it lay was easily to be ascertained by soundings to be taken by Mairs; for he had notice that the soundings taken by the city, for whatever purpose they were made, were not to be relied upon, but were to be verified by him. That being so, it seems to me that the case was precisely within section 14 of the specifications, by which all loss or damage arising "from unforeseen obstructions or difficulties which may be encountered" was at the peril of the contractor. But if that be not so, and if the location of the pipe was such that the city officials might have known of it, still it is quite clear that the park department did not know of it, any more than the contractor did, and that the difficulty arose from the incumbrance of the pipe, which was discovered after the work had been begun; and that brings it precisely within the other provision of the specifications, that loss or damage arising from "any incumbrance on the line of the work" was to be sustained by the contractor. The word "incumbrance" there must necessarily be construed as intending anything which, being discovered, would prevent or delay the contractor in the performance of his contract. It necessarily included everything in the line of the work which had that effect. There was no warranty by the city that the line of the work was free from incumbrances, and it was expressly provided that, if any were discovered, loss or damage to the contractor by them was to be sustained by him. I do not see any escape from the conclusion that, whether it was an unforeseen obstruction or not, it was clearly an incumbrance, and was thus precisely within the terms of the contract.

There is nothing in the case of Horgan v. Mayor, etc., 160 N. Y. 516, 55 N. E. 204, that militates against this conclusion. In that case the plaintiff had agreed to clear and concrete the bottom of a park lake for the city of New York, and the contract contained provisions that the contractor should drain off all the water, and that he should furnish

all pumping and bailing required for that purpose, and should satisfy himself as to the nature and the amount of the work to be done, by a personal·examination.     There was an outlet pipe in the bottom of the· lake, apparent to the contractor, and he had the right to suppose that he could use that outlet to drain the water from the pond.     When he· attempted to drain off the water, he found that the sewer into which. the pipe drained was obstructed so that a considerable amount of the water in the pond would not run off through it, and the contractor was· consequently compelled to pump out the water;  and he claimed to recover the increased cost of doing that work.     It was held that as the outlet pipe, if it had been in order, would have been sufficient to draw off the water, the plaintiff had a right to rely upon the fact that it was· so, and could be used for that purpose, and that it was the duty of the· city so to keep the pipe, and that, if it failed to do its work because it was out of order, the city was liable for the damages caused by that failure.     In respect of the agreement that loss or damage arising from any unforeseen obstruction or from any incumbrance in the line of the work should be sustained by the contractor, it was held that the unforeseen obstructions and the incumbrances intended were those which· might be encountered during the progress of the work under the contract, and not those which might be encountered because of the fail-· ure of the appliances furnished by the city for the use of the contractor· to accomplish the purpose for which they were designed.     That case,. therefore, is not an authority against the defendant in deciding the one· at bar, but, rather, if it is to be considered at all, it tends to show that the construction of this contract claimed by the defendant was the proper one.

By the contract the city was at liberty to charge Mairs with certain liquidated damages because of any unnecessary delay that might occur in doing the work.     In the settlement with him, the city's officers did\ not see fit to charge him for the delay while waiting for some arrange-· ment to be made about the pipe, but allowed him the 43 days during· which the delay continued.     On that account it is said that the fact that they allowed him the 43 days operates as an admission on the· part of the city that it was responsible for that delay.     But it cannot be said that, if the city saw fit to waive its right to charge liquidated· damages against him, that is any reason why it should be charged with· damages for which it is not responsible.

For these reasons, the judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event.     All concur,. except PATTERSON, P. J., who dissents.