BARKER et al. v. CITY OF NEW YORK.

(Circuit Court of Appeals, Second Circuit.    April 10, 1917.)

No. 166.

1. MUNICIPAL CORPORATIONS ⬿360(3)—CONTRACTS—CONSTRUCTION—COMPEN-
SATION.

A contract with a city for the construction of an aqueduct required ex-
cavation to a certain line, within which no material should remain, but
provided for payment to an arbitrary fixed line, outside the line so speci-
fied, whether excavation should be carried to the payment line or not; it
being intended to be a fair average of necessary excavation. It provided
that the contractor should excavate an open trench, as required, between
points to be designated; that whenever the words "directed," "required,"
"ordered," "prescribed," etc., should be used, it should be understood that
the direction, etc., of the engineer was intended; that the work should
be done in conformity with the directions of the engineer as given from
time to time; that the engineer should make all necessary explanations
of the specifications and give all orders and directions contemplated;
that the work should conform to the lines and grades and be done in
accordance with the drawings and directions given by him from time to
time, subject to such modifications or additions as he should determine
to be necessary; that exact shapes and dimensions of the excavation
and of the aqueduct should be prescribed from time to time; and that,
when the materials at the established subgrade should be too soft or un-
satisfactory for supporting the aqueduct, the materials should be ex-
cavated to such additional depth and within such limits as might be
ordered, for which one of the prices stipulated, according to location,
would be paid. *Held* that, where the engineer ordered the aqueduct made
wider than the contract drawings called for, the payment line followed the
modifications directed by him, and the contractor was entitled to payment ·
to the line as so changed, and not merely to the payment line shown by
the contract drawings.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
892.]

2. MUNICIPAL CORPORATIONS ⬿360(3)—CONTRACTS—CONSTRUCTION—COMPEN-
SATION.

Under a provision of such contract that, wherever the lower portion of
the trench was in rock, that part of the excavation should be measured
as if excavated with certain specified slopes to the surface of the rock;
that the side slopes of the excavation in earth, for measurement purposes,
should start at the rock surface, four feet from the measurement line
for excavation in rock, and be measured as 1 vertical on 1 horizontal;
such four feet was to be measured from the measurement line for exca-
vation in rock as changed by the engineer.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
892.]

3. MUNICIPAL    CORPORATIONS    ⬿360(3)—CONTRACTS—CONSTRUCTION—COM-
PENSATION.

Under provisions of the contract that the payment line for excavation
was the payment line for refill, that embankments were to have certain
dimensions and slopes, that the contractor should make such modifications
as might be ordered, and payment should then be made to the ordered
lines, and that the quantity of refilling and embanking to be paid for
would be the quantity in the finished refills or embankments below the
prescribed lines and above the original surface of the ground or prescribed
excavation line, whether or not the excavation might have been taken
out fully to the prescribed lines, the contractor was entitled to payment

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

for refilling and embanking to the line as changed by the engineer, though actual excavation and refilling was not done within the enlarged spaces, as the contract did not contemplate that work was to be paid for only when actually done, but fixed an arbitrary line upon which payments were to be based.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892.]

4. MUNICIPAL CORPORATIONS ☞352—CONTRACTS—CONSTRUCTION—COMPENSATION.

Under provisions of such contract that the quantity of concrete masonry to be paid for should be that deposited in place in accordance with the drawings, specifications, or requirements, and that, wherever the aqueduct was of such type that masonry was to be built against the sides of any excavation, the concrete should be measured as if the excavation were made exactly to the prescribed lines, the contractor was entitled to payment for concrete masonry to the payment line, although not actually placed, since, if the "prescribed lines" meant the lines prescribed for concrete, and not for excavation, or the line to which the engineer ordered the concrete placed, and the concrete was therefore to be measured as placed, there would be no use for the words "as if," or the word "excavation."

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 883.]

5. MUNICIPAL CORPORATIONS ☞360(1)—CONTRACTS—CONSTRUCTION—COMPENSATION.

Under provisions of the contract relative to the tunnel for such aqueduct, that the contractor should excavate all ledge rock to lines shown on the drawings or ordered, and that the quantities to be paid for should be the number of cubic yards of ledge rock before excavation, reckoned to the payment line, and a further provision that the contractor should bear all losses resulting on account of the character of the work, or because the nature of the land in or on which the work was done was different from what was assumed or expected, where rock outside the payment line fell into the excavation by reason of unexpected faults in the rock, and had to be broken by blasting and then removed, the contractor was not entitled to payment therefor.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892.]

6. MUNICIPAL CORPORATIONS ☞360(7)—CONTRACTS—ENGINEER'S CERTIFICATE—CONCLUSIVENESS.

Under a provision that the engineer should in all cases determine the amount, quality, etc., of the work to be paid for, and decide every question which might arise relative to the fulfillment of the contract, and that his estimate and decision should be final and conclusive upon the contractor, the engineer's decision that the contractors were not entitled to payment for removing rock which fell into the excavation from outside the payment line was conclusive against the contractor, in the absence of unfairness or fraud.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892½.]

7. MUNICIPAL CORPORATIONS ☞360(7)—CONTRACTS—CONSTRUCTION—COMPENSATION.

Under provisions making the engineer's decisions as to the amount of work to be paid for conclusive upon the contractor, and providing that the inspection of the work should not relieve the contractor of any of his obligations, that defective work should be made good, and unsuitable materials might be rejected, though such work and materials had been previously overlooked by the engineer, and accepted or estimated for payment, and that if the work, or any part thereof, should be found

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

defective before the final acceptance of the whole work, the contractor should forthwith make good the defect, where the engineer and inspector marked points needing to be trimmed to complete the excavation to the contract lines, but failed to mark a great many of such points until after the tunnel had been otherwise completed, and the contractors were put to considerable expense in trimming them, the engineer's decision that the contractor was not entitled to payment therefor was final and conclusive on the contractor.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892½.]

In Error to the District Court of the United States for the Southern District of New York.

Action by Benjamin Barker and another, as receivers of Patterson & Co., a copartnership, against the City of New York. Judgment for plaintiffs for an insufficient amount, and they bring error. Reversed, and new trial granted.

Spencer, Ordway & Wierum, of New York City (Nelson S. Spencer, of New York City, of counsel), for plaintiffs in error.

Lamar Hardy, Corp. Counsel, of New York City (Terence Farley, Charles J. Nehrbas, and John F. Collins, all of New York City, of counsel), for defendant in error.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. This is an action to recover damages for breach of contract. The city of New York on March 24, 1909, entered into a contract in writing with the firm of Patterson & Co., which had its principal office in the city of Pittsburgh, in the state of Pennsylvania. The contract was made by the city, through the board of water supply, by virtue of the power vested in it by chapter 724 of the Laws of 1905 of the state of New York, and the amendments thereto, for the construction of a portion of the Hudson river division of the Catskill aqueduct, including Bull Hill tunnel, in the town of Phillipstown, Putnam county, N. Y., and was known as "Contract 22." After the execution of the contract Patterson & Co. entered upon the performance of the work therein specified, and did a large amount of work, and furnished a large amount of materials in executing the same.

On September 20, 1910, a decree was entered in the Circuit Court of the United States for the Southern District of New York, appointing the plaintiffs temporary receivers of all the property, business, rights, assets, and effects of said firm. That decree also authorized the receivers to conduct the work under contract No. 22 until the further order of the court. They were also empowered:

"To institute suits at law or in equity for the recovery of any estate, property, damages, or demands existing in favor of the said copartnership, and in their discretion to compound and settle with any debtor of the copartnership, or with persons having possession of its property, or in any way responsible at law or in equity to the said copartnership."

The receivers thereafter and pursuant to the decree took possession of the properties of the said copartnership, managed and operated the same, and conducted the work under contract No. 22, with the consent

of the board of water supply and of the defendant. On October 13, 1910, a further decree was entered, and the temporary receivers were made permanent, with authority to conduct the work under the contract; and they completely performed the work and during the progress of it received from time to time from defendant payments on account.

The contract contained the following provision concerning the final payment on completion of the work:

"Whenever, in the opinion of the engineer [defined to be the chief engineer of the said board of water supply], the contractor shall have completely performed this contract on his part, the engineer shall so certify, in writing, to the board, and in his certificate shall state, from actual measurements, the whole amount of work done by the contractor, and also the value of such work under and according to the terms of this contract. On the expiration of 40 days after the acceptance by the board of the work herein agreed to be done by the contractor, and the filing of a certificate of the completion and acceptance of the work in the office of the comptroller, signed by the chief engineer and the board, the city shall pay to the contractor, in cash, the amount remaining after deducting from the amount or value stated in the last-mentioned certificate, all such sums as shall heretofore have been paid to the contractor under any of the provisions of this contract, and also any sum or all such sums of money as by the terms hereof the city is or may be authorized to reserve or retain."

After complete performance of the contract the chief engineer duly certified in writing to the fact. Thereupon the board of water supply accepted the work and a certificate to that effect, signed by the engineer and the board, was filed in the office of the comptroller of the city. The certificate stated that the work was completed on September 7, 1912. It also stated that the value of the work was $724,642.97, and that the amount due was $98,518.17. The amount therein stated to be due was paid to the plaintiffs, less the sum of $4,000, which the comptroller refused to pay on the ground that the amount retained was improperly included in the final certificate.

The complaint which the plaintiffs have filed alleges three causes of action. The first is for the recovery of the $4,000 included in the final certificate and which the comptroller has refused to pay. The second and third causes of action are based upon items not included in the final certificate, but which the plaintiffs claim should have been included. At the close of the trial counsel for plaintiffs moved the court to direct a verdict in their favor for the sum of $4,000 principal and $352 interest on the first cause of action. The motion was granted. He then moved that a verdict be directed in favor of plaintiffs for the sum of $5,640 principal and $497.03 interest, making a total of $6,-137.03, on the second cause of action. This was denied. He then moved that a verdict be directed in favor of plaintiffs in the sum of $39,-446.30 principal and $3,476.21 interest, making a total of $42,922.51, on the third cause of action, making a final total of $53,411.54. This was denied. He then asked to go to the jury on the second cause of action, as to the amount to which the plaintiffs were entitled to recover. This was denied. He then asked to go to the jury upon the third cause of action, upon a direction that the plaintiffs were entitled to recover upon an assessment of damages to be made by the jury. This was de-

nied. He then asked to go to the jury upon the question as to whether or not the contract lines were in fact given by the engineers of the board of water supply to the plaintiffs, and whether those lines were erroneous, and also upon the question of damages which the plaintiffs suffered by reason of the error; and this was denied. The jury accordingly brought in a verdict for $4,352, pursuant to the court's direction.

Thereafter the court granted a motion of defendant's counsel and reduced the verdict to $2,109.98. The defendant concedes, therefore, that the sum of $4,000 arbitrarily deducted by the comptroller was erroneous, and that only $2,060.68 should have been deducted, if its defense is good. Whether its defense is good is the question which arises under the first cause of action, and which must now be considered.

As respects the first cause of action, attention has been already called to the fact that, while the final certificate showed that there was due to the contractors $98,518.17, the comptroller only paid the plaintiffs $94,518.17, retaining $4,000. It appears that the contract provided that the city should not be precluded or estopped by any certificate given by the board, or the chief engineer, or any other agent of the city, from at any time showing the correct amount and character of the work done or that the certificate was incorrect, or that the work done or materials furnished did not in fact conform to the specifications. By virtue of the above provisions the comptroller contended, and the city interposes it as a defense to the first cause of action, that the engineer extended the lines of payment in violation of the terms of the contract, and that the contractor was permitted to change the type of aqueduct to a type not shown on the contract drawings and that the final certificate was incorrect and improperly made.

This sum of $2,060.68, which the defendant now claims should be deducted, is made up of three items: (1) A deduction of $1,681.57 for open cut excavation work; (2) a deduction of $325.93 for refilling and embanking; (3) a deduction of $53.18 for concrete masonry in open cut and on embankment.

We shall consider these various items in their order. The general scheme of the contract is that the waterway should be excavated to a certain specified line shown on the contract drawings, within which no material of any kind could be permitted to remain. In order to secure this result, it was necessary that actual excavation should be carried beyond this specified line, because in earth the sides of the excavation slip into the excavated prism, and in rock the blasts cannot be made to break geometrically true. The city undertook to pay, therefore, for excavated material removed, refilling, and other work done to an arbitrary fixed line, called the payment line, outside of the specified line within which no material could remain, and it undertook so to pay, whether excavation was carried to this arbitrary line or not, or beyond it. The reason for this was that, given the width of the bottom of the invert of the aqueduct under normal conditions, the payment line was intended as a fair average of necessary excavation; if in any part of this section of the aqueduct the soil or rock proved better than the average, the contractor was to get the benefit in the

cost of the work of actual excavation; if it proved worse than the average, he was to lose the cost of necessary excavation and refilling beyond the payment line.

The scheme of the contract contemplated, therefore, that the contractor might find it necessary to do certain work outside of the contract payment lines for which he would not be entitled to payment, and, again, that he would be entitled to payment, for work inside of the payment lines which had not been found necessary to perform. The theory of this was that these items would offset each other and would result in a fair average to both parties.

[1] That payment has been made to the payment lines shown on the contract drawings is admitted; and the question presented to us is whether the contractors are entitled to be paid according to a changed payment line fixed by the engineer which required the contractors to perform additional work. That the contractors performed additional work is not disputed. The aqueduct was made wider than the contract drawings called for. This was done because the engineer thought widening necessary, owing to the character of the earth or rock which was found at the time of the excavation. The board of water supply therefore ordered a thicker side wall for the aqueduct and the payment line was moved back one foot. The contract expressly provides that:

"The contractor shall excavate an open trench for the aqueduct, as required, between points to be designated," etc.

It provides that:

"Whenever in the specifications or upon the drawings the words 'directed,' 'required,' 'permitted,' 'ordered,' 'designated,' 'prescribed,' or words of like import, are used, it shall be understood that the direction, requirement, permission, order, or prescription of the engineer is intended," etc.

It provides that all the work must be done—

"strictly pursuant to, and in conformity with, the attached specifications, and the directions of the engineer as given from time to time during the progress of the work, under the terms of this contract, and also in accordance with the contract drawings."

It provides that:

"The engineer shall make all necessary explanations as to the meaning and intention of the specifications, shall give all orders and directions contemplated therein or thereby and in every case in which a difficult or unforeseen condition shall arise in the performance of the work required by this contract."

It provides that:

"The work, during its progress and at its completion, shall conform to the lines and grades given by the engineer, and shall be done in accordance with the drawings and directions given by him from time to time, subject to such modifications or additions as he shall determine to be necessary during the work."

It provides that:

"Wherever the bottom of the aqueduct trench is in rock, it shall be excavated and the aqueduct constructed substantially in accordance with the type designated 'In Rock and Earth' on sheet 10. Exact shapes and dimensions will be prescribed from time to time."

It provides that:

"Wherever the materials at the established subgrade are too soft or unsatisfactory for supporting the aqueduct, either by reason of the excavation being partly in earth and partly in rock, or for any other reason, the materials shall be excavated to such additional depth and within such limits as may be ordered, for which one of the prices stipulated in items 2 to 5, according to location, will be paid."

It is apparent that the contract drawings were intended to indicate the general lines and plans upon which the work was to be conducted, and that the contract contemplated that the conduct of the work might require modifications, alterations, or additions, necessitating the payment of additional compensation to the contractor. In this case the materials at the established subgrade were found unsatisfactory and the engineer ordered new limits under the authority of the specifications. It is contended that the excavation in rock and earth should be measured as provided in section 2.14 of the contract "as of the bottom width shown on the drawings," and that, no matter how much the bottom width may have been extended by the engineer, such extension could not affect the payment lines. This is to overlook the provisions as to the obligation of the contractor to observe the directions and requirements of the engineer and especially the provision in section 2.3 that where the materials are too soft or unsatisfactory the materials shall be excavated "within such limits as may be ordered, for which one of the prices stipulated in items 2 to 5, according to location, will be paid," and again the provision in section 2.13 that excavation shall be measured for payment "as of the cross-section included within the prescribed limits hereinafter described and of the actual length made in accordance with directions." The words "prescribed" and "directed," as has been pointed out mean prescribed or directed by the engineer.

The authority of the engineer to widen the aqueduct and to require the additional excavations is not doubtful. It follows that the payment line described in the specifications follows the modifications directed by the engineer.

[2] Section 2.14 of the specifications provides how excavation is to be measured for payment where the aqueduct trench is wholly in earth, and it provides a different rule where the trench is in rock. As to the latter, and it is that with which we are now concerned, it provides as follows:

"Wherever the lower portion or the whole of the aqueduct trench is in rock, that part of the excavation shall be measured as of the bottom width shown on the drawings and as if excavated with the side slopes of 6 vertical on 1 horizontal, up to the points at which these slopes intersect the outside surface of the concrete section of the aqueduct. Above these points the measurement shall be made as if excavated with a horizontal beam of 1 foot at such point of intersection, and with the side slopes of 6 vertical on 1 horizontal up to the surface of the solid rock, as shown for the section 'In Rock and Earth' on sheet 10. Wherever the lower part only of the aqueduct trench is in rock, the side slopes of the excavation in earth, for the purposes of measurement, shall start at the surface of the solid rock, 4 feet out from the measurement line for excavation in rock and shall be measured as 1 vertical on 1 horizontal."

The bottom width shown on the drawings having been increased by the engineer for reasons already stated, the line of payment ascends

from that width on a side slope of 6 vertical on 1 horizontal (with a 1-foot beam where the slopes intersect the outside surface of the concrete) to the surface of the solid rock.

It is conceded by defendant that, to the surface of the solid rock, the engineer had authority to move the payment line; and the comptroller has in fact paid the plaintiffs, both for excavation and refilling, for work done below the surface of the rock, although neither the excavation nor the refilling was made altogether to the payment line. The contention of the city is that the remainder of the measurement specified in section 2.14, above quoted, should not be followed. The Board of Water Supply followed the direction specified in section 2.14. It measured out 4 feet from the measurement line for excavation in rock, as fixed by the increased width of the invert, and to which line the comptroller does not object and for which excavation in rock he has paid. The comptroller, on the other hand, measured 4 feet out from the line as shown on the drawing for rock and earth on sheet 10. That makes his measurement in the typical sheet 2½ feet, instead of 4 feet.

In doing this the comptroller is not only inconsistent with himself, because he has recognized the engineer's line below the surface of the rock, but he is without warrant in the contract.

[3] As respects the second item, which relates to the deduction for refilling and embanking, little need be said. The facts relating to it are substantially the same as those concerning excavation. It is admitted that the excavation lines prescribed by the engineer included a volume wider than that shown by the contract drawings in the instances with which we are concerned. The plaintiffs, therefore, were entitled to payment to the lines as prescribed by the engineer; for the specifications declare that "the payment line for excavation is the payment line for refill," and after declaring that embankments are to have in general the dimensions and slopes shown on the drawings the specifications provide that:

"The contractor shall make such modifications in the lines as may be ordered, and payment shall then be made to the ordered lines."

They also provide that:

"The quantity of refilling and embanking to be paid for will be the quantity in the finished refills or embankments below the prescribed lines and above the original surface of the ground or the prescribed excavation lines, whether or not the excavation may have been taken out fully to the prescribed lines."

The prescribed lines mean, as we have already held, the lines prescribed by the engineer. As the defendant's only claim is, as respects the item now under consideration, that it should not pay for the additional volume included between the lines shown by the contract drawings and the lines prescribed by the engineer, its defense to the claim is without merit.

The District Judge based his decision upon the ground that actual excavation and refilling was not done within the enlarged spaces. He admitted that, if it had actually been done, the defendant would have been bound to pay for it, inasmuch as the engineer had ample au-

thority under the contract to order the excavation. In this position he is without support from the provisions of the contract. There is not a single instance which may occur under the contract where work of construction is to be paid for only when actually done. In every such case such work is to be paid for to an arbitrary line, known as the payment line.

[4] The third item involved, relating to concrete masonry, presents the same point that was involved in the two preceding items, namely, whether or not concrete is to be paid for to the payment line, although not actually placed. The specifications provide in this particular, as in the case of refilling, that payment shall be made to the prescribed lines for excavations. The language is:

"Wherever the aqueduct is of such type that masonry is to be built against the sides of any excavation, the concrete shall be measured as if the excavation were made exactly to the prescribed lines."

The claim of the corporation counsel that "prescribed lines" means lines prescribed for concrete, and not for excavation, is a strained construction, which we cannot accept. What do the words "as if" mean, unless they mean to provide a mathematical, and not an actual, volume for which the concrete is to be measured? And why use the word "excavation" at all in this connection, if the concrete is to be measured "as placed?" The contract drawings show a payment line for concrete above the rock surface, as well as for concrete below the rock surface. Below the rock surface the comptroller has paid for concrete to the prescribed lines. Above the rock surface he disputes the right of the contractors to payment, although there is no warrant whatever in the language of the contract, that we have been able to discover, for making any distinction based upon the rock surface. The only essential is that the concrete is to be built against the side of the excavation. If this is done, and it was done in this case, payment must then be made to the prescribed lines. The language of the contract (section 11.32 of the specifications) is that:

"The quantity of concrete masonry to be paid for under items 11 and 12 shall be that deposited in place in accordance with the drawings, specifications, or requirements," and whenever "masonry is to be built against the sides of any excavation" (not an excavation below the surface of the rock, but any excavation), "the concrete shall be measured as if the excavation were made exactly to the prescribed lines."

Neither is there anything in the claim that "prescribed" refers to the line to which the engineer ordered the concrete to be placed. The contractors were obligated by the contract to conform to the engineer's orders, and by the terms of the contract they cannot be deprived of compensation for having done so; and as they are entitled to compensation for excavation and refill to the prescribed lines, although excavation and refill were not actually made, and, as the defendant concedes, they are entitled to be paid for concrete below the surface of the rock to the prescribed lines, although not actually placed, so for the same reasons they are entitled to like compensation for concrete above the surface of the rock to the prescribed lines.

[5] The second cause of action is upon a claim that there should have been included in the final certificate $5,640 representing rock ex-

cavated at $6 a cubic yard, that being the price for rock excavation as fixed in the contract. It is claimed that because of "faults" in the rock the blasting of the tunnel resulted in the removal of more rock than was expected or intended, and that the contractors should have been paid for the removal of this excess quantity of rock. The contract provided that the contractor should "excavate all ledge rock encountered in the grade tunnel to lines shown on the drawings or ordered in accordance with section 52, and in a manner to fulfill section 35 and sections 46 to 50." It also provided that the quantities to be paid for under the preceding provision "shall be the number of cubic yards of ledge rock before excavation, reckoned everywhere to the authorized 'B line.'" The "B line" is a line shown on the contract drawings. It is a line specified to be fixed arbitrarily 13 inches outside of the "A line" shown on the contract drawings, which latter line is a line within which no unexcavated material of any kind could be permitted to remain.

The plaintiffs alleged that during the course of the work they excavated 940 cubic yards of rock encountered in the grade tunnel to the "B line." The engineer refused to include that work in his certificate, and the comptroller refused to pay for it. The court below had also rejected the claim for reasons we do not find it necessary to pass on. The 940 cubic yards of rock involved in this claim relate to rock outside the "B line," and which fell from the sides or roof of the tunnel; the fall being occasioned by seams in the bedrock. This rock, after it had fallen, had to be broken up by blasting and then removed. It is said that, as the rock fell from defects in the formation, and was not contemplated in the specifications, nor by the contractors, when bidding, it should be allowed for. Every blast makes rock tumble into the hole or bore already made when a tunnel is being driven, and why the contractors should receive extra pay because the blast brings down more rock than was expected, or because it falls where it was not intended it should fall, we confess ourselves unable to see. Certainly the contract does not authorize such payments, and we know of no principle of law which entitles a recovery. Not only does the contract not authorize such payment to be made, but it makes clear that the contractors assumed the risk of just such happenings as they now complain of; for the contract expressly provided that the contractors should bear "all losses resulting * * * on account of the character of the work or because the nature of the land in or on which the work is done is different from what is assumed or was expected." See Mairs v. Mayor, 52 App. Div. 346, 65 N. Y. Supp. 160; Dunn v. City of N. Y., 205 N. Y. 342, 351, 98 N. E. 495. We think that this put upon the contractor the risk of such faults in the land as might cause rock to fall into the tunnel. The contractor is under the contract to be paid only for excavation to the "B line" and is not entitled to charge for removing the rock that slipped beyond it.

In Merrill-Ruckgaber Co. v. U. S., 241 U. S. 387, 36 Sup. Ct. 662, 60 L. Ed. 1058, the plaintiff entered into a contract for the construction of the foundation for the extension of the United States Assay Office in the city of New York. The contract provided that the work was to be done in accordance with the specifications, and specifications

and drawing were to be reciprocally explanatory, and the decision of the supervising architect as to the proper interpretation of the drawings and specifications was to be final. The contractor brought suit for extra work claimed to have been done on the foundations of the building. There being ground for dispute as to whether the work performed was extra work or was required by the terms of the contract, the decision of the architect was held to be final; there being no just foundation for a charge of unfairness on his part.

[6] In the instant case the contract provides in article 3 as follows:

"To prevent disputes and litigations. the engineer shall in all cases determine the amount, quality, acceptability, and fitness of the several kinds of work and materials which are to be paid for under this contract, shall determine all questions in relation to said work and the construction thereof, and shall in all cases decide every question which may arise relative to the fulfillment of this contract on the part of the contractor. His estimate and decision shall be final and conclusive upon said contractor, and in case any question shall arise between the parties thereto, touching this contract, such estimate and decision shall be a condition precedent to the right of the contractor to receive any money under this contract."

This court is of the opinion, following the doctrine recognized in Merrill-Ruckgaber Co. v. U. S., supra, that by virtue of the above provision the engineer had authority to determine every question as to the amount the contractors were entitled to be paid under the contract, and that his decision is final and conclusive as against the contractors, in the absence of fraud, although not conclusive upon the city of New York. His final certificate was his decision as to what the contractors were entitled to receive for the work performed, and, as there is no charge of unfairness or fraud, his decision stands, and the court is not at liberty to go behind it.

[7] The third cause of action is upon a claim for damages for work required by the engineer to be done in retrimming the tunnel after completion. This claim the District Judge thought could not be sustained. This claim differs from the first two claims, in that it is not based upon any precise provision of the contract, but is founded upon an alleged increased cost of the work occasioned by the acts of the defendant, or its agents or engineers. The complaint alleges that prior to September 20, 1910, the contractors had fully completed the work of excavation upon that portion of the work to be done under the contract for the tunnel known as Bull Hill tunnel, and that the work as done conformed to the lines and grades as fixed by the engineer. It is said that thereafter the engineer ascertained that the lines and grades as given by him were erroneous, and that he then directed the contractors to perform, and that they thereupon did perform, a large amount of excavating within the tunnel outside of the lines and grades first given by him. And the plaintiffs claim to have proved that the amount of the damages they are entitled to, according to their computation is $39,446.30, exclusive of interest.

The allegation is not sustained by the facts. The specifications provided that all lines and grades were to be given by the engineer, and that the work should conform to the lines and grades given by him, and be done in accordance with the drawings and his directions.

The engineer did in fact give the lines and grades and directions as to driving the tunnel; and one of the contractors testified that he did not know of any erroneous lines having been given to him by the engineer or other agents of the city in the tunnel work. It appears that the engineer and inspector established the center line of the tunnel by sighting back through lights hung in the roof of the portion already excavated. Having so obtained the center line, they painted that line on the heading—that is, the face of the rock—and, after measuring out certain distances from it, painted an elliptical line to mark the new portion to be excavated. This elliptical line was intended to be the C line of the contract drawings; that is, the line which is the line of effective average thickness of masonry lining. The contractors then drove the holes for blasting, filled them with dynamite, shot the blast, and removed the muck. The result was not a clean break. There were portions of rock remaining inside of the "A line," within which no unexcavated material was to remain. The engineer and inspector then drew a new line on the heading for a new excavation, and at the same time marked with red paint the points remaining from the last blast inside the A or C line, which the contractors had to remove or "trim" off. To the extent that the contractors did this trimming at the time when they drilled the holes for the new excavation on the heading, it was done easily and inexpensively, as the drilling machines were in place. When not then done, it had to be done by the re-erection of the drilling machines on platforms or scaffolding at a considerable expense. The holes drilled in these points to be trimmed were likewise filled with dynamite and shot off at the next blast. This process was repeated until the tunnel was completed.

It was found, after the tunnel had been driven through, which was on December 24, 1910, that the engineers required the retrimming of the tunnel, and the contractors were engaged in doing that work for five months. There were very few places not necessary to be trimmed, so as to excavate to the "A line." That was properly fixed; but it is said that the inspectors did not, on their first inspection of the rock excavation, paint all the rock projections found to extend inside the "A line," and that this was equivalent to the giving of erroneous lines. But, as the contractors were bound to excavate everything within the "A line," and the "A line" was not erroneously fixed, it is not clear what basis there is in view of article 13 for the claim advanced. Article 13 of the contract provides as follows:

"The inspection of the work shall not relieve the contractor of any of his obligations to fulfill his contract as herein prescribed, and defective work shall be made good, and unsuitable materials may be rejected, notwithstanding that such work and materials have been previously overlooked by the engineer and accepted or estimated for payment. If the work or any part thereof shall be found defective before the final acceptance of the whole work, the contractor shall forthwith make good such defect in a manner satisfactory to the engineer."

However that may be, there is a conclusive reason why the third claim cannot be sustained. We are unable to distinguish the third claim from the second, and think that the one is as much subject to article 3 as the other. That article was inserted in the contract to

prevent disputes and litigations, and the engineer's decision was, as we have seen, made final and conclusive on the contractor. For the reasons stated, this case does not fall within the principle that, if a municipal corporation by its own act causes the work done by a contractor to be more expensive than it otherwise would have been, according to the terms of the original contract, it is liable to him for the extra work. Messenger v. City of Buffalo, 21 N. Y. 196; Mulholland v. Mayor, etc., 113 N. Y. 631, 20 N. E. 856.

A case in the Supreme Court of New York, H. S. Kerbaugh, Inc., v. City of New York, reported in the New York Law Journal of September 23, 1915, and affirmed without opinion by the Appellate Division, New York Law Journal, March 3, 1917, 163 N. Y. Supp. 1120, involved the construction of an aqueduct contract similar in its provisions to the one here involved. The controversy in that case, as in this, was over the three items relating to excavation, refill and concrete. The comptroller objected in that case, as in this, to certain work and materials not actually done and supplied. The city claimed that the payment lines shown upon the contract drawings could not be allowed by the engineer although the exigencies of the undertaking required additional work to be done under his direction. There, as here, the engineer fixed the payment line upon the extended width of the excavation. The case was decided against the city and in favor of the contractor. It was held that the engineer had power to alter or modify the specifications, and, as he had exercised that right, the payment lines shown upon the drawings ceased to control, and the contractor was entitled to compensation to the changed payment line, whether it was necessary for him to perform the work or not.

As respects the first two disputed items, we have reached the same conclusion at which the New York courts arrived in the case cited. As respects the third item—that relating to the concrete—our conclusion is at variance with that of the New York courts in the case referred to. This court holds, therefore, that as respects the first cause of action it was error for the court below to grant the motion of defendant's counsel to reduce the verdict, which the court originally directed on behalf of plaintiffs for the sum of $4,352, to the sum of $2,-109.98. As respects the second and third causes of action, no error was committed.

Judgment is reversed, and a new trial granted.