# MERRILL–RUCKGABER COMPANY *v.* UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 281. Argued March 17, 1916.—Decided June 5, 1916.

In construing a contract the court must at first resort to its words, but not to one or a few of them, but to all of them as associated, and as well to the conditions to which they were addressed and intended to provide for; one word cannot be made dominant, controlling all others, and putting out of view the demands of physical conditions.

In this case *held* that a contractor was bound to underpin the walls of both of two buildings on the line of the Government's property, notwithstanding the specification referred to building in the singular and not plural, and the wall of one of the buildings was only a light or curtain wall.

Under the contract involved in this case, the decision of the supervising architect was made final upon any dispute regarding the proper interpretation of the specifications, and as the Secretary of the Treasury sustained the decision, and no foundation appears in the record for charges of unfairness on the part of the latter, such decision is final.

49 Ct. Cl. 553, affirmed.

APPELLANT is a New York corporation. It filed a petition in the Court of Claims for the recovery from the United States of the sum of $4,475.90 for extra work performed in the construction of the foundation for the

extension and remodeling of the United States assay office in New York. Issue was joined on the petition and the Court of Claims, after hearing, dismissed it. 49 Ct. Cl. 553.

The facts pertinent to the questions presented, collated from the findings, are as follows:

The appellant entered into a contract with the United States through the proper officers of the latter for the construction of such foundation for the sum of $79,400.00 in accordance with specifications and drawings prepared in the office of the Supervising Architect.

The specifications required bidders to visit the site and fully inform themselves of the character of the same and the conditions under which the work would have to be performed and failure to do so, it was provided, would not relieve the successful bidder from the necessity of furnishing material or performing any labor that might be required to complete the work in accordance with the true intent and meaning of the specifications and drawings without additional cost to the Government.

The specifications, it was provided, should supplement the drawings, and specifications and drawings were to be reciprocally explanatory and the decision of the Supervising Architect as to the proper interpretation of the drawings and specifications was to be final.

Under the heading "Excavation" it was provided that "certain portions of old foundation walls, etc., have been left in place as retaining walls in connection with adjoining buildings; the removal of these walls and the north wall and so much of the present front building as may be necessary to install work under this contract and such other excavation in connection therewith as may be necessary are to be included . . . The walls, etc., will have to be removed and the excavation made in such manner as not to endanger adjoining property nor prevent the occupancy of the present front building, and all neces-

sary shoring and underpinning, etc., in connection therewith must be done."

Subsequently the Supervising Architect sent to all parties from whom proposals had been solicited the following addendum amending the foregoing paragraph of the specifications:

"Bidders are hereby informed that the specification is to be amended as follows: Page 7, fourth paragraph, under 'Excavation,' after the clause 'and all necessary shoring, underpinning, etc., in connection therewith must be done,' add 'In the case of the building joining the north line of the site, the underpinning of the main rear walls must be carried to rock by a method satisfactory to the Supervising Architect.'"

A detailed contract was entered into providing that the work was to be done in accordance with the specifications and the addendum thereto and the requirements of certain specified drawings and such other detail drawings and models as might be furnished to appellant by the Supervising Architect.

It was further provided that changes might be made in the work and materials when required by the United States, the value of such work and materials to be determined on the basis of the contract unit of value, at prevailing market rates, such rates, in case of dispute, to be determined by the Architect, whose decision should be binding on both parties, and that no claim for damages on account of such changes or for anticipated profits should be made or allowed. No claim for extra materials or work was to be made or allowed unless specifically agreed upon in writing or directed in writing by the United States.

The assay office extension was located practically in the middle of the block bounded by Wall, Nassau, Pine and William Streets and among the buildings surrounding the site were two on Pine Street numbered 25, 27 and 29. Number 25 was ten stories and Nos. 27 and 29 (being one

building) was thirteen stories above the street, and each was one story higher at the line of the assay office extension.

Appellant submitted detail drawings showing its proposed method of underpinning and protecting the walls of the Pine Street buildings. Referring to the drawings the Architect telegraphed the inquiry why they did "not show underpinning 25 Pine Street extending to rock," to which appellant replied that in accordance with the addendum to the specifications it understood that the building referred to meant 27–29 Pine Street as No. 25 Pine Street had no rear wall but simply a light metallic curtain wall supported on the side walls, and that appellant did not consider there was any rear wall in the building and, therefore, it (appellant) showed the side walls to be taken care of in the usual manner and believed its method so provided.

Much correspondence ensued, and finally appellant was told that it was the opinion of the Architect's office that its letter of the 2nd instant (October, 1909) correctly set forth the position of the office and that it was of the opinion the work as therein set forth was required by the contract and that appellant was not entitled to extra therefor, and appellant was directed to carry out its contract without further delay in accordance with that letter. To which appellant replied that the cost of the underpinning to rock of the walls of No. 25 Pine Street would be $4,800 in addition to the price named in the contract and concluded as follows:

"'As the contract does not expressly or impliedly require us to underpin to rock premises 25 Pine Street, we shall proceed with the work under the contract, taking necessary steps to protect said premises, but will not underpin any portion thereof to rock except upon the understanding that we are to be paid the reasonable cost thereof, as indicated above.'

"To which the Supervising Architect replied, on October 30, 1909: 'Your statements are noted and you are now directed to proceed without further delay to complete the work in line with office letters of the 2d, 20th and 26th instants, and without expense to the Government. And you are advised that unless you take action along this line within a reasonable time consideration will be given to serving the eight days' notice preparatory to the Government assuming charge of the work and completing it at your expense.'

"Upon appeal to the Secretary of the Treasury the action of the Supervising Architect was ratified, and the claimant was directed in writing by the Secretary to proceed with said underpinning in accordance with the requirements of the Supervising Architect, otherwise the contract would be completed at claimant's expense. The claimant did the work under protest, and completed it and all of the work under said contract within the time stipulated in the contract. The actual cost of underpinning to rock said building No. 25 Pine Street was $4,450. The contractor was paid the full amount of the contract price, $79,400."

The use of the word "building" in the addendum to the specifications was the result of a clerical error in the office of the Supervising Architect. But before submitting a proposal for the work appellant through its president and agent made an investigation of the site of the work and the buildings surrounding the site and ascertained that the rear of both the buildings on Pine Street adjoined the site on the north.

*Mr. John S. Flannery,* with whom *Mr. Frederic D. McKenney* was on the brief, for appellant.

*Mr. Assistant Attorney General Huston Thompson* for the United States.

Mr. Justice McKenna, after stating the case as above, delivered the opinion of the court.

The case is in narrow compass. It involves for its solution the construction of a contract, and the rules to guide such construction we need not rehearse. To its. words we at first resort, but not to one or a few of them but to all of them as associated, and as well to the conditions to which they were addressed and intended to provide for. The argument of appellant ignores this rule. As we shall see, it makes one word dominant, controls all others by it, and puts out of view the demands of the physical conditions.

The contract provided that whatever walls would have to be removed and excavations made would have to be done in such manner as not to endanger adjoining property, and that all necessary shoring and underpinning, etc., in connection therewith had to be done. To this provision there was subsequently added that "in the case of the *building* [italics ours] joining the north line of the site the underpinning of the main rear walls must be carried to rock by a method satisfactory to the Supervising Architect."

But there were two buildings "joining the north line of the site," and appellant selected one as the full measure of its obligation to carry the underpinning to rock as required by the specifications, giving as a reason, in a communication to the Architect's office, that it did not consider that there was any rear wall in No. 25 Pine Street, but only a metallic curtain wall.

The Architect's office was not impressed with the distinction between walls and the selection of one building joining the north line of the site but insisted that the underpinning of the main rear walls of both of the buildings joining such line must be carried to rock by a method satisfactory to the Supervising Architect. Appellant

filed its appeal to the Secretary of the Treasury, who affirmed the action of the Architect.

Counsel intimates unfairness on the part of the Supervising Architect, but there is no just foundation for it; and, besides, there is no attempt to impugn the good faith of the Secretary of the Treasury who sustained the decision of the Architect, and the contract explicitly provides that "the decision of the Supervising Architect as to the proper interpretation of the drawings and specifications shall be final." If we may concede to appellant an ambiguity in the specifications arising from the use of the singular word "building" instead of the plural word "buildings" against the material conditions which appellant's officers had inspected and knew of and against as well the other parts of the specifications which among other things call for "rear walls" instead of a "rear wall," seemingly implying two buildings and not one only, at the utmost it could only be said that there was ground for dispute, and under the contract the decision of the Architect upon the dispute was final.

*Judgment affirmed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.

# UNITED STATES *v.* JIN FUEY MOY.

### ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

No. 525.   Argued December 7, 1915.—Decided June 5, 1916.

A statute must be so construed, if fairly possible, as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score. *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366.

This court cannot assume to know judicially that no opium is produced in this country; nor is it warranted in so assuming when construing a statute itself purporting to deal with producers of that article.

When Congress contemplates the production of an article within the United States, this court must construe the act on the hypothesis that such production takes place.

An attempt of Congress to make possession of an article—in this case opium—produced in any of the States a crime, would raise the gravest question of power. *United States* v. *De Witt,* 9 Wall. 41.

In construing a statute which calls itself a registration or taxing act and does not purport to be in execution of a treaty and which contains a provision not required by any treaty, a grave doubt arises whether such a statute is entitled to the supremacy claimed for treaties on the ground that it does in effect carry out existing treaty obligations on the general subject of both treaty and statute.

While the Opium Registration Act of December 17, 1914, may have a moral end, as well as revenue, in view, this court, in view of the grave doubts as to its constitutionality except as a revenue measure, construes it as such.

Every question of construction is unique, and an argument that might prevail in one case may be inadequate in another.

Only definite words will warrant the conclusion that Congress intended to strain its powers, almost, if not quite, to the breaking point, to make a great proportion of citizens *prima facie* criminals by mere possession of an article.

The words "any person not registered " in § 8 of the Opium Registration Act of 1914 do not mean any person in the United States, but refer to the class dealt with by the statute—those required to register—and one not in that class is not subject to the penalties prescribed by the statute.

225 Fed. Rep. 1003, affirmed.

THE facts, which involve the construction and application of the act of December 17, 1914, relating to registration of, and tax on, persons producing and dealing in opium and other specified drugs, are stated in the opinion.

*Mr. Assistant Attorney General Wallace,* with whom *Mr. William C. Herron* was on the brief, for the United States:

Section 8 of the act should not be restricted to those persons who are required to register and to pay the tax. *United States* v. *Portale,* 235 U. S. 27.

The decision of the court below goes only to the construction and not the constitutionality of the act; hence, the only question open on this writ of error is that of the construction of the act. *United States* v. *Barber,* 219 U. S. 72; *United States* v. *Keitel,* 211 U. S. 370; *United States* v. *Mescall,* 215 U. S. 31; *United States* v. *Portale,* 235 U. S. 31; see also *United States* v. *Barnow,* 239 U. S. 74; *United States* v. *Blunt* (Nor. Dist. Ill., not yet reported); *United States* v. *Brown,* 224 Fed. Rep. 135; *United States* v. *Wilson,* 225 Fed. Rep. 82; *United States* v. *Woods,* 224 Fed. Rep. 278.

The act is not exclusively a revenue measure, but is also one to comply with treaty obligations; see Treaty of 1912 and President's message of April 21, 1913.

The bill originated from the State, and not the Treasury, department.

The two acts of January 27, 1914, and this act were all enacted to comply with the treaty; see President's message of August 9, 1913. The Harrison Act was to cure conditions existing just before the passage of this bill.

The assertion that the acts were not passed pursuant to any treaty is erroneous as reports of committees show that purpose. Even without them, however, the court could not infer that revenue was the sole reason for the bill.