### DOCK CONTRACTOR CO. v. CITY OF NEW YORK et al.

(Circuit Court of Appeals, Second Circuit. January 7, 1924.)

No. 48.

1. **Municipal corporations ⊕═352—As between city and street railway company city held liable for breach of construction contract.**

Where, pursuant to a contract made under the New York Rapid Transit Act between the city of New York and the Interborough Rapid Transit Company, by which the city agreed to construct lines, which should be its property, but operated by the company as lessee, with the right to call on the company for contributions to a certain maximum amount, the city made a contract for the construction of a subway, fixing the amount for which the company should be liable thereon, but with the right to divert such payment to other uses, the city and not the company, is the party liable to the contractor for a breach of the contract.

2. **Contracts ⊕═285(2)—Contract for subway held to require contractor to underpin adjacent buildings.**

A contract with a city to construct a railroad subway construed, and *held* to require the contractor to underpin all adjacent buildings whose foundations were above a specified level, and to pay for such work at the contract price, and not to leave to the engineer the determination of the necessity for such underpinning.

3. **Contracts ⊕═284(4)—Decision of engineer based on a misconstruction of the contract not binding on the parties.**

A provision of a construction contract making the decision of the engineer conclusive as to certain matters does not apply to a decision based on a misconstruction of the contract.

4. **Appeal and error ⊕═1151(3)—Appellate court cannot increase the award made by the jury.**

On writ of error to review a judgment at law the appellate court is without power to increase the award made by the verdict of a jury.

5. **Municipal corporations ⊕═1002—Interest not recoverable on claim until filed.**

Under the law of New York claims against a municipal corporation do not bear interest until filed with the comptroller of the city.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Dock Contractor Company against the City of New York and the Interborough Rapid Transit Company. From the judgment, plaintiff and the City bring error. Reversed on plaintiff's writ of error.

Writs of error from the United States District Court for the Southern District of New York. Action by Dock Contractor Company, plaintiff, against the city of New York and Interborough Rapid Transit Company, defendants, to recover damages for breach of contract. Judgment in favor of the Dock Contractor Company against the city of New York and dismissing the complaint as to the Interborough Rapid Transit Company. 'The city of New York and the Dock Contractor Company each appeal. Reversed.

⊕═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

George P. Nicholson, Corp. Counsel, of New York City (John F. O'Brien and Willard S. Allen, both of New York City, of counsel), for city of New York.

Warren Leslie, of New York City (Martin Conboy, of Riverdale-on-Hudson, N. Y., and Harry W. Alden and H. A. Butler, both of New York City, of counsel), for Dock Contractor Co.

James L. Quackenbush, of New York City (Henry J. Smith and Albert J. Kenyon, both of New York City, of counsel), for Interborough Co.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. On these writs of error the parties will be designated as below, plaintiff and defendants.

The plaintiff contracted with the city of New York, the latter acting through the Public Service Commission of the First District, and the Interborough Rapid Transit Company, on September 27, 1915, for the construction of a part of the Eastern Parkway Rapid Transit Railroad, route No. 29, section 2, to be built on Nostrand avenue, in the borough of Brooklyn, city of New York. It completed its full obligation in the performance of this contract work. Claiming a breach of the contract on the part of the city of New York and the Interborough Rapid Transit Company, it seeks to recover damages in this action. On the trial, the plaintiff's charge of the breach was that in constructing this railroad it underpinned, as required by the contract, 5,629.41 lineal feet of adjoining buildings, and that it has not been paid the contract price of $85 per lineal foot of building for such underpinning. The city of New York did pay for 935 feet of underpinning. Of the 4,694.41 lineal feet unpaid for, the plaintiff has recovered for 2,795.41 lineal feet found by the jury to be necessary work under the contract, and under a charge which submitted this question of necessity for underpinning as one of fact. The court ruled that the city of New York was not liable for the balance of the work. The complaint was dismissed as against the Interborough Rapid Transit Company. Both the contractor and the city of New York have been allowed writs of error. The city of New York's contention is that the contractor is entitled to no recovery, whereas the contractor contends that it is entitled to full recovery for the full number of lineal feet of houses underpinned.

[1] Upon this writ the city of New York contends that, if either of the defendants is responsible, judgment should go against the Interborough Rapid Transit Company to the extent of the unpaid balance owing by the Interborough Company on the contract providing for the construction of this subway. Both contract No. 3 and the contract in suit were made under the authority of the Rapid Transit Act (chapter 4 of the Laws of 1891). Under contract No. 3 the city of New York agreed to construct the railroads, including section 2, route 29, and the Interborough Company, which is referred to in contract No. 3 as the lessee, agreed to contribute toward the cost of construction. The limit of its liability was $58,000,000. The Interborough Company established that its contribution under contract No. 3 had already been exhausted without consideration being given to any liability for future

payments under section 2, route 29, of the contract. If this be true, then, under article 12, contract No. 3, if a recovery were had against the Interborough Company, it would mean that the Interborough Company could make a demand on the city of New York to settle and pay the claim of the plaintiff as embodied in any judgment against the Interborough Company, and it would be the obligation of the contract for the city of New York to pay it. Assuming that the contribution was not exhausted, the Interborough Company would then be obligated to make its full contribution of $58,000,000 under contract No. 3. But the city of New York must pay the entire balance of the cost of construction, whatever that may be, and, in the end, the Interborough Company is not obligated to do more than meet its contribution.

The Rapid Transit Act vests in the Public Service Commission, acting for the city of New York, the entire control of laying out routes and general plans for municipal rapid transit railroads and adopting detailed plans and specifications therefor; also preparing advertising, and awarding construction contracts and enforcing these contracts so awarded, except as certain of these powers and duties were vested in the board of estimate and apportionment and in the corporation counsel or other agents of the city of New York. The corporation counsel of the city of New York must approve the contract as to form; the board of estimate and apportionment must consent to the contracts and make an appropriation before they were executed. The Commission, acting for the city of New York, has charge of acquiring the lands, easements, and rights of way for rapid transit purposes by condemnation proceedings or otherwise. The Interborough Company is excluded from these functions, and section 58 provides that "any such railroad shall be and remain the absolute property of the city." The city of New York is to have sole supervision and direction of construction; the Commission acting for the city of New York prepares advertisements and awards the contracts; the Interborough Company has the right to make suggestions as to the form of contract, which may be disregarded by the Commission, whose decision is final and binding. The Commission determines which construction contracts the Interborough Company shall be made a party to for the purpose of distributing its contribution, and the maximum amount for which the Interborough Company shall be liable under each of such contracts. The Commission could not compel the Interborough Company to enter into any contract which, with its other commitments, would cause its maximum contribution of $58,000,000 to be more than exhausted.

Article 35 provides that the contractor shall look to the Interborough Company for the payment of the sums earned upon this contract to an amount up to but not exceeding $1,607,752.17, which the Interborough Company agrees to pay at the time and in the manner and upon the terms and conditions provided, and to the city of New York for all sums over and above such amount; the Interborough Company is not liable thereunder beyond this amount. Articles 35, 37, and 38 incorporate the terms and conditions as to the payments and conditions relative to the manner of payments which article 9 of contract No. 3 requires to be incorporated in all construction contracts to which the Interborough

Company is made a party for the purpose of disbursing part of its contribution. It is thus obvious that the contract is a city contract for the construction of a city-owned railroad for the benefit of the city of New York, under the supervision and direction of the city's agents and under contracts prepared, advertised, and awarded by the Commission acting for the city of New York, as provided in the Rapid Transit Act. The security given by bidders ran solely to the city of New York, and the right of action against any bidder to whom the contract might be awarded, who failed to sign the contract, is given solely to the city of New York. The city, by the Commission and its engineer, has complete control over the making of the contract and the vouchers for payment, and the Commission has a right in its discretion to require the Interborough Company, instead of paying over its contribution under the contract here in question to the contractor, to apply such contribution or any part thereof to other purposes, such as replenishing the security held by the city of New York or satisfying a claim of the city of New York against the contractor for liquidated damages, or paying the expenses of completing the work in the event of the contractor's default, through other city agents or contractors. We regard the city of New York responsible for the breach of contract established here, and hold that no error was committed in dismissing the complaint as against the Interborough Rapid Transit Company.

[2] Section 2, route 29, provides for a two-track underground subway extending under Nostrand avenue from a point near Church avenue to a point near Flatbush avenue, a distance of 6,610 feet. The subway structure is of steel bents and concrete. The work was to be prosecuted by open cut method of excavation. The width and depth of the cut was sufficient to accommodate a subway structure as well as to permit the contractor to relocate the sewers, pipes, and sub-surface structures. It was provided in the contract that the sides during construction, would be maintained by suitable methods of sheeting and bracing. Vertical wooden sheeting was driven down on each side of the cut, and as the sheeting was driven down the material between the two lines of sheeting was removed. This sheeting was braced from side to side by transverse braces which would hold the sheeting against the bank on either side. The contractor conceded by the provisions of the contract, as well as the specifications and drawings that, if the work was done without fault or negligence on its part, it did not involve any danger to adjacent buildings, and it provided that it would, at its own expense, make good any damage to such buildings. It further provided that the liability of the contractor was absolute and not dependent upon any question of negligence, and that the neglect of the engineer of the city of New York to direct the contractor to take any particular precautions or to refrain from doing any particular thing should not excuse the contractor in case of damage. It was to indemnify the city of New York against claims for damages, and it was to be directly liable to owners, tenants, and occupants of adjacent buildings for all physical injuries to person or property, and it contracted to indemnify and save harmless the city of New York from such liabilities. Among other things, the contract provided as follows:

"Sides to be Secured.

"Section No. 67. The sides of the excavations shall be secured against slips by suitable sheet piling or sheeting, held in place by braces, shores or walling timbers, special precaution being taken where there is additional pressure, due to the presence of buildings or other structures. Where a movement of the ground might cause the settlement of an adjacent building, the sheeting must be started, if near the building, before the elevation of the bottom of the foundation of the building is reached; if away from the building, at such depth of the excavation as the engineer may permit; and the excavation must not be made in advance of or below the bottom of the sheeting.

"Filling Back of Sheeting.

"Section No. 68. Sheeting shall be driven wherever possible, but when it is placed against the sides of the excavation, the spaces or voids back of the sheeting must be immediately and carefully filled with suitable material to prevent as far as possible the natural ground back of the sheeting from moving.

"Buildings Underpinned.

"Section No. 69. (1) The contractor shall secure buildings adjacent to the excavations, either in accordance with sections Nos. 67 and 68, in the case of buildings supported on firm soils when a slope represented by one (1) foot veritcal to two (2) feet horizontal, inclining downward from the bottom outer edge of any building foundation, intersects or passes beneath the bottom outer edge of the completed railroad structure; or

"(2) When compliance with the provisions of sections Nos. 67 and 68 is not sufficient to secure adjacent buildings or when necessary to prevent improper pressure against the railroad structure when completed, the contractor shall safely and permanently underpin adjacent buildings the foundations of which are above the bottom of the adjacent excavation for the railroad. By underpinning is meant such method of construction as will transmit the foundation loads directly through the underpinning structure to such lower level as is necessary to secure the buildings and which will relieve the adjacent ground from improper lateral pressures. The underpinning shall be designed to furnish a safe and permanent independent support for each building. To accomplish this result, the contractor shall use such methods of underpinning, pneumatic or otherwise, as special conditions may require and the engineer shall approve; or

"(3) The contractor shall, subject to and only with the approval of the engineer, in lieu of underpinning, construct such form of permanent construction as may be necessary to maintain, protect and secure the adjacent buildings against displacement, provided the safety of the completed railroad structure will not be endangered by improper pressures from such form of construction and such adjacent buildings.

"Before the work is proceeded with, the contractor shall submit to the engineer drawings in duplicate indicating the proposed typical and special methods of underpinning, or of maintaining, protecting and securing the adjacent buildings."

Section 70 provides for payment for the work of underpinning. The contractor asserts that under these various provisions of the contract it was obliged to underpin every building whose foundations were above the slope of one foot vertical to two feet horizontal, drawn upward from the bottom outer edge of the completed railroad structure. This is the slope referred to in subdivision (1), section No. 69, above. The contractor in prosecuting the work construed the contract to mean that every building on the subway whose foundations were above the 1 to 2 slope had to be underpinned, and accordingly did so. The city of New York claims that the contractor was to be paid only for under-

pinning where the city's engineer determined that it was necessary, and it relies, in asserting nonliability, upon section 24 of the contract, which reads as follows:

### "Engineer to Determine.

"Article XXIV. To prevent disputes and litigations, the engineer shall in all cases determine the classification, amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for under this contract, shall determine every question in relation to the works and the construction thereof and shall determine every question which may arise relative to the fulfillment of this contract on the part of the contractor. His determination and estimate shall be final and conclusive upon the contractor, and in case any question touching this contract shall arise between the parties hereto, such determination and estimate shall be a condition precedent to the right of the contractor to receive any money under this contract."

The court below ruled that the city of New York was responsible only for that work of underpinning which was performed and found by the jury to be necessary for the protection of the buildings. Whereever the engineer authorized the underpinning, the plans were approved and the work was paid for, and where the engineer refused to authorize the underpinning the plans were returned without approval and the contractor was told underpinnings were unnecessary. However, the contractor informed the engineer in each instance that the underpinning was necessary, and would be done, and payment therefor would be claimed, and the contractor thereupon proceeded to and did underpin the building in accordance with the plans submitted. No claim is presented here that the underpinning or the methods of underpinning used in each case not paid for were different than the methods which were used in instances in which the city of New York made payment. The city of New York now contends that the determination of its engineer as to the necessity for the underpinning was final and conclusive upon the contractor in the absence of fraud. The contractor did not claim below, nor does it here, that the underpinning of certain of the smaller buildings was in fact absolutely necessary, but its contention is that the contract required it to underpin such buildings, since they were found above the 1 to 2 slope. We regard the contract as requiring the contractor to underpin all such buildings. Articles 45, 47, and 48 of the contract clearly express the intention of the parties to make the contractor an insurer against injury to all buildings, and require it to assume absolute liability toward the property owners and the city. Under article 16 the work was contracted to be done in the most workmanlike manner and with the highest regard to the safety of life and limb, and article 15 of the specifications provides that all the work would be prosecuted in a manner according to the local conditions best calculated to permit rapidity in construction and to secure safety of life and property and to reduce to the minimum any interference with the abutting property and the public travel. This obligation was contracted for without modification. It required the highest degree of care and diligence in the prosecution of the work.

This record points out a variety of dangers which had to be considered and guarded against by the parties resulting in provisions for

underpinning. It is sufficient to say, however, that the contract provided for underpinning. Article 10 of the contract provides that, in order to construct the railroad, it will be necessary for the contractor to "protect, support and maintain all buildings  *  *  *  and to do all such additional and incidental work as may be necessary for the completion of the railroad and the reconstruction and restoration  *  *  * of all abutting property and buildings which may have been directly or indirectly affected, disturbed or injured by the contractor in the progress of the work of construction to as useful, safe, durable, and good a condition as existed before construction was begun."

It was stipulated below that the contractor submitted a plan to the proper engineer of the Public Service Commission for the First District showing the proposed method of underpinning the buildings, and required that such plan be approved; that the refusal was put upon the ground that underpinning was not necessary and the work was not paid for; that the contractor in each case protested, notifying the engineer that such underpinning was necessary and demanding payment therefor; that it proceeded to and did underpin each of such buildings in accordance or substantially in accordance with the plans submitted, and that the method of underpinning planned and proposed in each such building was the same method or substantially the same method pursued for underpinning buildings for which payment was allowed. A further stipulation was entered into setting forth the work performed. Thus, there is a mathematical calculation agreed upon showing all of the buildings above the 1 to 2 slope which were underpinned and which amount to 5,629.41 lineal feet, of which 935 lineal feet have been paid for, leaving a balance of 4,694.41 unpaid for.

We think that under section 69 the 1 to 2 slope was intended by the parties as the division line between the buildings to be secured by sheeting and bracings. It does not provide any payment for securing buildings above a 1 to 2 slope by sheeting and bracing or by any means other than underpinning. Section 1 provides that the contractor must secure all buildings whose foundations are below the 1 to 2 slope and rest on firm soils by suitable methods of sheeting and bracing in accordance with sections 67 and 68. When coupled with the provision in paragraph 2, that when compliance with the provisions of sections 67 and 68 is not sufficient to secure adjacent buildings the contractor must underpin them, this indicates that compliance with the provisions of sections 67 and 68 will not be regarded as sufficient to secure the adjacent buildings when they are above the 1 to 2 slope, but that in such cases underpinning is necessary. The contractor was justified in concluding that the 1 to 2 slope was referred to as a distinguishing line between the buildings, to be secured by sheeting and bracings and buildings to be underpinned. If it were intended that it should secure any buildings above the 1 to 2 slope by sheeting and bracing, it would be expected that express provisions to that effect would be found in the contract. No such provision is found in section 69 nor in any other provision. The intendment is clear to provide for one class of buildings in paragraph 1 and in paragraph 2 to provide for all buildings not included under paragraph 1 of that section. Paragraph 2 is intended to

provide for all "adjacent buildings the foundations of which are above the bottom of the adjacent excavation for the railroad," except only when those buildings embraced in paragraph 1, namely, buildings whose foundations are below the 1 to 2 slope and which rest on firm soils. Paragraph 2 refers to buildings whose foundations are below the 1 to 2 slope, but do not rest on firm soils, and to all buildings whose foundations are above the 1 to 2 slope, whether the soil be firm or not. If it were the intention of the parties that any buildings above the 1 to 2 slope were to be secured by sheeting and bracing and not to be underpinned, express provision in the contract would be found stating how that work of securing these buildings by sheeting and bracing was to be paid for. Section 70 provides that "when a building is secured as provided in (1) of section No. 69, payment for the work shall be deemed to be included in the prices stipulated in the schedule for excavation." Therefore the excavation prices include payment for securing those buildings whose foundations are below the 1 to 2 slope and rest on firm soils because these are the only buildings provided for in subdivision 1, section No. 69, and section No. 70 does not state that the excavation prices are also to include the payment for securing by sheeting and bracing any building above the 1 to 2 slope. This indicates that such buildings were to be underpinned and paid for under item 4.

The title of section 70 is "Payment for Underpinning and Securing," and seems to be the one provision of the contract that covers this work. We regard sections Nos. 69 and 70 as expressing the intention of the parties to provide for the whole matter of securing or underpinning the buildings and payment therefor, and they provide the three classes which the parties had in mind: First, the securing by sheeting and bracing of buildings below the 1 to 2 slope in firm soils; second, the underpinning of all other buildings; and, third, the maintaining, protecting, and securing of buildings in lieu of underpinning. This section is subdivided into three distinct and separate paragraphs, each numbered separately, clearly intending to cover all such work, and the only reference made in them to securing buildings by sheeting and bracing is where the buildings were below the 1 to 2 slope. If it had also been intended that the buildings above the 1 to 2 slope were to be secured by sheeting and bracing, the contract would be expected to contain some provision therefor.

We cannot adopt the city's contention that the 1 to 2 slope is a limitation upon the power of the engineer, and that he had no power to order any buildings underpinned which rested on a firm soil below that slope. The engineer could order buildings underpinned even though they were below the 1 to 2 slope if they did not rest on firm soil or if they would bring an improper pressure against the railroad structure when completed. We do not think the engineer could order any building, whether below or above the 1 to 2 slope, underpinned or not, as in his judgment the conditions might require. To do so would render the 1 to 2 slope line meaningless, and, indeed, it would be eliminated from the contract. It would be inconsistent with what the parties expressed in the contract. It was the angle of repose for the earth mate-

rials agreed upon. It gave intelligent instructions to bidders in making estimates for the work and to thereafter carry on the work.

Article 24 leaves to the engineer the determination of classifications, amounts, quality, acceptability and fitness of the work and his determination as to these matters is final. The necessity for underpinning was determined by the parties and expressed in the contract. The parties expressed the determination to have the work done thereby and provided payment therefor. This did not leave open to the engineer to determine the necessity for underpinning, nor did it leave the question open for a jury later to pass upon it at the peril of the contractor.

Again, article 25 provided:

"The neglect of the engineer to direct the contractor to take any particular precaution such as the precaution of underpinning, shall not excuse the contractor in case of damage to any building."

The engineer's determination upon the necessity for underpinning is therefore not made final or conclusive upon the contractor. The parties particularly expressed the intention of making the underpinning an absolute contractual obligation of the contractor and the contract compelled it to pay for any loss caused by breach thereof. While section 69 (2) provides that the methods of underpinning shall be such as the engineer shall approve, this does not mean the necessity therefor. Subdivision 3 of the same section provides that the contractor shall, subject to and only with the approval of the engineer, in lieu of underpinning, construct such form of permanent construction as may be necessary to maintain, protect, and secure the adjacent buildings against displacement. Thus, only when the engineer approved, the buildings could be secured by means other than underpinning. Nowhere, where the subject of underpinning is considered, is there an intention expressed that, if in the judgment of the engineer underpinning is necessary, it shall be placed. But, on the contrary, the mandatory provisions of section 69 provide that the contractor shall safely and permanently underpin adjacent buildings when sections 67 and 68 are not sufficient to secure them. Under article 24 of the contract, the engineer is not permitted to interpret or construe the contract. The parties have made their agreement and the court must interpret or construe the contract.

[3] The defendant refers us to Barker v. City of New York, 242 Fed. 359, 155 C. C. A. 126. There suit was based on three causes of action. The first was recovery of items which the engineer included in his estimate, but which the city comptroller refused to pay. A recovery was had and sustained. The second cause of action was for the removal of rock outside the pavement line which had fallen into the excavation by reason of unexpected faults in the rock. The engineer refused to estimate, and payment was disallowed. The third cause of action was for work required by the engineer to be done in retrimming the tunnel after completion. The contract pointed out explicitly the work which was to be done and how it was to be measured for payment. The engineer was merely determining the measurements and quantities of the work thus done. His decisions upon the claims disallowed were strictly in accordance with the contract, and they were held to be binding and conclusive, in the absence of fraud. Nothing was disallowed

by the engineer which the contractor there was obliged to perform and for which payment was provided. In this case, it is apparent from the above that the engineer merely misconstrued the contract, and such a decision by the engineer is never final.

In Merrill & Ruckgaber Co. v. United States, 241 U. S. 387, 36 Sup. Ct. 662, 60 L. Ed. 1058, the contractor was required to underpin the main rear walls of a building adjoining the north line. The contractor declined to underpin the rear walls of the building, saying it was only required to underpin one building, and that the other building, in any event, did not have a rear wall, but only a metallic curtain wall. The supervising architect insisted that the main rear walls of both buildings be underpinned. The contract provided that the decision of the supervising architect as to the proper interpretations of the drawing and specifications should be final. The court declined a recovery by the contractor, sustaining the claim of the government that there was a minor inconsistency in the specifications resulting in a clerical error, that the phrase "rear wall" seemingly required two buildings, and not only one, and that the most that could be said was that there was ground for dispute, and under the contract the decision of the architect upon the dispute was final.

Here the contract provided for the work and payment therefor. See King Iron Bridge Co. v. City of St. Louis (C. C.) 43 Fed. 770; Lewis v. Chicago (C. C.) 49 Fed. 710; Gammino v. Town of Dedham, 164 Fed. 600, 90 C. C. A. 465; Uvalde Contracting Co. v. City of New York, 160 App. Div. 287;[1] Merrill-Ruckgaber Co. v. City of New York, 160 App. Div. 515, 145 N. Y. Supp. 577. It was error in ruling below that the payment for the work of underpinning could be recovered by the contractor only where it was found by the jury to be necessary. The contractor was entitled to recover for the underpinning of 4,694.41 lineal feet unpaid for, at $85 per lineal foot.

[4] Upon the plaintiff's writ of error, it is urged upon us that this is a mathematical calculation, and that we should increase the verdict by adding to the recovery had below the sum of $161,415. This we cannot do. The case was submitted to the jury on improper instructions. This record contains a stipulation in writing that 4,694.41 lineal feet of houses above the 1 to 2 slope were actually underpinned, and payment therefor has not been made. The new trial which must be had can be very much shortened by the use of this stipulation. We have no power to increase the amount of the award, and it will be necessary for the judgment to be reversed and remitted to the District Court for further trial in conformity with this opinion.

[5] The plaintiff has further assigned as error the failure of the court below to allow interest on 85 per cent. of the value of the underpinning from the time such 85 per cent. would have been paid if allowance for such underpinning had been included in the monthly partial estimates. Also, that it should receive interest upon the whole value of such underpinning from a date 90 days after the completion of all the work. The work was completed March 22, 1919. The final payment became due under the contract June 20, 1919. Claims against a municipal corporation do not bear interest until they are filed with the

[1] 145 N. Y. Supp. 604.

comptroller of the city. O'Keeffe v. New York, 176 N. Y. 298, 68 N. E. 588; Smith v. Board of Education, 208 N. Y. 87, 101 N. E. 791, Ann. Cas. 1914D, 406. Interest should be allowed from the date the claim was filed with the comptroller of the city of New York, i. e., February 8, 1919. Interest, however, should be allowed on 85 per cent. from February 8, 1919, to June 20, 1919, and after that date on the aggregate amount found to be due the plaintiff.

Judgment reversed.