PER CURIAM:
This appeal from an order of Judge Cooper in the District Court for the Southern District of New York, affirming an order of Bankruptcy Judge Babitt in the Chapter XI proceeding of United Merchants and Manufacturers, Inc. (UM&M), turns solely on the interpretation of Article III, C9 of UM&M’s Plan of Arrangement.
UM&M had filed its petition under Chapter XI on July 12,1977. It proposed a Plan of Arrangement (hereafter the Plan) on March 14, 1978. This was confirmed on June 30, 1978 and consummated July 1, 1978. The Plan created five classes of unsecured creditors, of which we are concerned only with Class I, general and unsecured creditors. Article III, B and C of the Plan provided that such creditors were to receive an initial payment of not less than 35% of their claims on July 1, 1978, and an additional 3% on December 31, 1978. The Plan also contained complex provisions for a payment on December 31, 1978, an “Additional Payment” on April 30, 1979, distributions on December 31, 1979, 1980 and 1981, and still further payments on or before October 31,1979 and on or before October 31 of each *805 subsequent year. Interest on the unpaid principal amount of all filed and allowed claims of Class I creditors was to begin to accrue and be payable, at the rate of 9% per annum, for the earlier of July 1, 1985 or July 1 of the fiscal year immediately following the fiscal year during which UM&M’s tax loss carry-forward expired or became fully utilized.
The framers of the Plan were obliged to take account of the fact that, due to the commendable speed with which the proceeding had been completed, an unusually large amount and percentage of the claims of Class I creditors had not yet been determined by the confirmation date. A certificate filed at the time of confirmation stated that the total claims of Class I creditors were in excess of $442 million but that over half of these, $289 million, were as yet undetermined. To deal with this problem, the Plan provided in Article III, C9, in pertinent part, as follows:
9. In connection with distributions to be made to Class I creditors pursuant to Article III, B and C of the Plan, so long as there remains outstanding a Claim of a Class I creditor which has not yet been finally determined in accordance with the Bankruptcy Act and the Rules of Bankruptcy Procedure, there shall be reserved from any such distribution the distribution which would have been made to such creditor as if its Claim had been a Filed and Allowed Claim or such lesser amount as the Bankruptcy Court may determine. Pending the determination of the Claim, an amount equal to the amount so reserved or such lesser amount as the Bankruptcy Court may have determined shall be placed at interest pursuant to the order of the Bankruptcy Court confirming the Plan. Interest earned shall be distributed at the time the deferred distribution is made and shall be in addition to all other payments to Class I creditors under the Plan. Upon any determination of any such Claim in whole or in part in favor of the debtors, the reserved amount less the amount paid by the debtors in respect of such Claim shall be paid to Class I creditors, Pro Rata, together with the interest earned thereon. Such distribution (exclusive of such interest) shall be applied to reduce the Filed and Allowed Claims of Class I creditors and shall not be credited against any other distributions or payments required to be made pursuant to the Plan.
Distributions of the amounts reserved as set forth herein and of the amounts to be distributed pursuant to Article III, C3, C4 or C5 shall be made at the earlier of (i) the date when the next scheduled distribution or payment (including an interest payment) is to be made under the Plan or (ii) such date as the amount of such aggregate distributions is equal to at least $5,000,000.
Appellants, Vertical Industrial Park Associates (VIPA) and Allison Realty Company (Allison), two New York limited partnerships with overlapping membership, were landlords of UM&M for large buildings under long-term leases which did not expire until 2004. On April 4,1978, less than three months prior to the confirmation of the Plan, UM&M obtained an order from the bankruptcy court permitting the rejection of its outstanding leases. VIPA filed three proofs of claim. One, filed on May 11,1978, was for damages, as limited by § 353 of the Bankruptcy Act, for $10,015,667 from the rejection of the lease; a second, filed on June 28, 1978, was an administrative claim of $279,536.04 for use and occupation by the debtor; a third, filed on June 29, 1978, was for $3,300,000, representing counterclaims previously asserted in a state court suit for extras supplied to UM&M during the construction of the building and delays caused by UM&M’s failure to provide adequate plans and specifications. Allison filed a claim for $2,165,765 on June 22, 1978, for damages resulting from the rejection. These claims remained undetermined at the time of confirmation.
Thereafter the debtor, relying on “the large number of claims filed and the procedural and mechanical problems of examining them and preparing and filing objections thereto where necessary and appropriate,” obtained an order extending its time *806 for objecting to claims and for bringing its objections on for hearing. On October 26, 1978, UM&M filed a motion to expunge or reduce VIPA’s claims and to allow counterclaims aggregating $1,583,852.48. On October 30, 1978, it moved to expunge Allison’s claim and also to assert a counterclaim. On November 2, UM&M and VIPA entered into a letter agreement whereby VIPA’s claims were to be allowed as a general unsecured claim in the amount of $7,236,500 and an administrative claim in the amount of $111,500, this to constitute a settlement of UM&M’s counterclaim. The letter recited that “[ijnterest on the claim will be paid as provided in the Plan of Arrangement.” On the same date UM&M and Allison entered into a letter agreement whereby Allison was to be allowed a general unsecured claim in the reduced amount of $750,000, and UM&M would abandon its counterclaim. Again the letter stated that “[interest on the claim will be paid as provided in the plan of arrangement.” On November 14, 1978, the bankruptcy court entered orders allowing the claims in the agreed reduced amounts. With respect to interest, however, the order said that the settlements “are without prejudice to claimant’s claims for interest as provided in the plan” and that “[s]aid claims shall be determined upon notice of motion by claimant.” When checks dated November 15, 1978, were issued to VIPA and Allison, they did not include post-confirmation interest. VIPA and Allison made appropriate motions to remedy this omission.[1] These were denied by the bankruptcy judge on the ground that interest on the total amount reserved on account of VIPA’s and Allison’s claims, both allowed and disallowed, should be paid pro rata to all Class I creditors. His decision was affirmed by the district court, and this appeal followed.
The provisions of Article III, C9 dictate the result urged by appellants. The first sentence directed the reservation from any distribution otherwise to be made to Class I creditors of “the distribution which would have been made to such creditor [i. e., a creditor whose claim had been filed but not allowed] as if its Claim had been a Filed and Allowed Claim or such lesser amount as the Bankruptcy Court shall determine.” The second sentence provided that such reserved sums, which, in view of the large amount of undetermined claims was bound to be substantial, should be placed at interest. Then came the third sentence, “[interest earned shall be distributed at the time the deferred distribution is made and shall be in addition to all other payments to Class I creditors under the Plan.” While the term “deferred distribution” is not defined, its natural meaning is the distribution made after the claim has been allowed and thus become entitled to the distributions it would have deserved from the outset if it had been allowed prior to consummation of the plan. Having thus provided for payment of interest on the sum that had been allowed, the draftsman turned to the problem of sums that had been reserved for claims that were disallowed and the interest thereon. Here there were two not unreasonable choices. One would have been to return these funds along with interest to the debtor, on the basis that, in the light of hindsight, it ought never to have been required to reserve so much; the other, adopted by the draftsman, was to provide that “[u]pon any determination of any such Claim in whole or in part in favor of the debtors, the reserved amount less the amount paid by the debtors in respect of such Claim shall be paid to Class I creditors, Pro Rata, together with the interest earned thereon.” The debtor benefited from this to the extent that, as provided in the fifth sentence, “[s]uch distribution (exclusive of such interest) shall be applied to reduce the Filed and Allowed Claims of Class I creditors and shall not be credited against any other distributions or payments required to be made pursuant to the Plan.”
We see no basis for the conclusions of the bankruptcy judge and the district court *807 that Article III, C9 demands a pro rata distribution to all creditors of interest accruing on the debtor’s reserved funds allotted to cover payments on a claim that has been allowed. Such a construction would leave the third sentence without a function, in defiance of the rule that, if possible, effect must be given to every sentence of an instrument. See Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 392-93, 36 S.Ct. 662, 664-65, 60 L.Ed. 1058 (1916); Restatement Contracts § 236(a) (1932); 4 Wil-Iiston, Contracts § 619, at 731-33 (3 ed. 1961). Moreover, and more important, the fourth sentence, which does deal with pro rata distribution, simply does not read on the distribution of interest on the allowed portion of a claim. It provides for the pro rata distribution of “the reserved amount less the amount paid by the debtors in respect of such claim . . . together with the interest earned thereon.” “Interest earned thereon ” means interest earned on “the reserved amount less the amount paid”, and not interest earned on the reserved amount simpliciter. Since the draftsman surely did not intend to leave a gap, the conclusion that the third sentence directs payment of interest on the allowed portion of the claim to the holder becomes irresistible.[2]
The conclusion thus emerging clearly from the language of the Plan is reinforced by considerations of equity and fairness. A creditor whose claim has been allowed prior to consummation has the use of the debtor’s payments from the time they are initially made; a creditor whose claim has not been allowed until some time after consummation due to the exigencies of administration [3] should obtain the nearest equivalent, namely, interest earned on that portion of the debtor’s reserve fund corresponding to his allowed claim to the date when he obtains his rightful place on the payment ladder. In some instances the construction urged by appellee could have grotesque consequences. Suppose a creditor filed a claim for $100,000 which was fully reserved against but was not allowed, until many months after confirmation, for $90,000. Under the reading of the courts below, he would have to share with other creditors not only the $10,000 difference and the interest thereon, as is fair enough, but the interest on the $90,000 as well. To be sure he would himself participate in the pro rata distribution of that interest, but why should he have to share in that at all with creditors having claims of over $200 million allowed prior to consummation who had had the use of the payments made thereon? A contract should be read, wherever possible, to achieve a result that is fair and sensible, not one that is harsh and inexplicable. See, e. g., 4 Williston, supra, § 620, at 748-49.
We have carefully reviewed the opinions below and find nothing in them which supports the conclusion reached. Judicial statements with respect to the nonallowa-bility of post-petition interest, e. g., Van-ston Bondholders Protective Committee v. Green, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946), are not helpful when the issue is whether a plan provided for interest on certain claims after confirma *808 tion. Other authorities cited are similarly inapposite. One can readily agree with the bankruptcy judge that, under the fourth sentence, “[t]he word ‘thereon’ refers to the reserved amount less the allowed amount of the claim”, but this does not answer the question here at issue, namely, the disposition of interest accrued on so much of the claim as was allowed. Indeed, as indicated above, the Plan’s language compels the conclusion that such interest should go to the holder of the late-allowed claim in order to equalize his position, as near as can be, with creditors whose claims had been allowed at the time of confirmation.
We inquired at argument whether other creditors holding late-allowed claims had received interest on the funds reserved to cover the allowed portion of their claims, and were told that they had not. But appellants, of course, are not bound by the passivity of other creditors. Whatever weight past practice may have — and appel-lees did not urge in their briefs that it had any — would be as a practical construction of the Plan. However, we lack the factual background needed to appraise this. For all that the record discloses, UM&M may have bargained with other creditors to abandon interest claims similar to those here asserted. We were told also that many late-allowed claims were small — suggesting that a few months’ interest may not have been sufficiently significant to warrant the cost of litigation. No argument was made that a reversal here would upset the administration of the Plan. Apparently, even if claimants similar to appellants who had accepted payment without interest are not barred by acquiescence or otherwise, a point on which we intimate no opinion, future interest accruals will be sufficient to make any needed adjustments. In any event past misconstruction of the Plan with respect to other creditors cannot defeat appellants’ rights.
The judgments are reversed and the cause is remanded to the district court with instructions to reverse the order of the bankruptcy court and remand to it with directions to allow the interest earned on the portion of the reserved amounts representing so much of appellants’ Class I claims as were allowed, up to the time when they received distributions.

. VIPA conceded at oral argument the correctness of the bankruptcy judge’s determination that it is not entitled to interest on the $111,500 allowed as an administration claim. Our opinion is to be read as limited to VIPA’s claim as a Class I creditor.

. Pointing out that under the second paragraph of Article III, C9, Class I, creditors with late-allowed claims must, for administrative reasons, ordinarily await payment even after their claims are allowed until one of the regularly-scheduled general distributions under the Plan, UM&M urges that the phrase “deferred distribution” should be construed to mean “the next distribution to all Class I creditors under the Plan.” But this is not what the third sentence says. Because of the express language of the third sentence and the fact that the fourth sentence relates only to interest on unneeded reserves, the holder of a late-allowed claim must receive interest on the amount reserved therefor.

. It should be noted that the class of creditors whose claims have not been “Filed And Allowed” include claimants whose claims had been allowed by the bankruptcy court prior to confirmation but which had not become final due to lack of expiration of the time for review. Article I, p. 3. In addition, the primary determinants of when objection to a particular claim is heard and decided are the choice of the debtor and the calendar of the bankruptcy judge. We perceive no reason why anyone would have wished that creditors whose claims fell toward the end of the line for reasons thus beyond their control should be treated worse than those who received distributions at earlier dates.