WAGNER WHIRLER & DERRICK CORP.
v.
UNITED STATES.
No. 47735.

United States Court of Claims.
June 8, 1954.

Horace S. Whitman, Washington, D. C., for plaintiff. Herbert Klosk, New York City, was on the briefs.

Laurence H. Axman, New York City, with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN Judges.

WHITAKER, Judge.

This action arises out of a contract dated December 15, 1941, between plaintiff and defendant whereby plaintiff agreed to manufacture and erect two 20-ton jib cranes at the Philadelphia Navy Yard for a consideration of $265,-000, which was later increased by two change orders to $278,192.13.

The controversy presented concerns the following four things:

(1) The extra cost to which plaintiff alleges it was put for completing parts of the cranes at the Philadelphia Navy Yard instead of at the plant of its subcontractor in New York, as the result of defendant's order to it to ship these parts of the cranes before they had been completed;

(2) Additions to or reductions in cost of performing the contract as a result of changes made;

(3) The cost of completing the contract by the defendant after it had terminated plaintiff's right to proceed;

(4) The cost to defendant of correcting allegedly defective work, which defendant asserts as a counterclaim.

All of the questions presented, except the cost of correcting defective work, have been decided by the Chief of the Bureau of Yards and Docks, who was the contracting officer, and his decision has been affirmed by the head of the department. Defendant says that under article 15 of the standard Government contract, as construed by the Supreme Court in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113, his decision is final and not subject to review, because of our finding that there is no proof of conscious wrongdoing on the part of the contracting officer or of the head of the department or of an intention on their part to cheat or defraud plaintiff; and this, notwithstanding our finding that the contracting officer's decision in many respects was arbitrary, capricious, grossly in error, and not supported by substantial evidence.

Since the case was tried and submitted, Congress passed Public Law 356, 83d Congress, 2d Session, approved May 11, 1954, 68 Stat. 81, 41 U.S.C.A. §§ 321, 322, which reads as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That no provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representa-

tive or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

"Sec. 2. No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

■ The rule to be applied, therefore, is not that laid down by the Wunderlich decision, but that set out in the Act quoted, since it applies to "any suit now filed or to be filed." That rule makes the decision of the head of the department final and conclusive, unless it is fraudulent or arbitrary or capricious or so grossly erroneous as to imply bad faith, or is not supported by substantial evidence.

Prior to the Wunderlich decision the rule laid down by the Supreme Court in quite a number of cases was that the decisions of the head of the department were not final where they were arbitrary, or capricious, or so grossly erroneous as to imply bad faith, or a failure to exercise an honest judgment. Burchell v. Marsh, 17 How. 344, 349, 15 L.Ed. 96; Kihlberg v. United States, 97 U.S. 398, 24 L.Ed. 1106; United States v. Gleason, 175 U.S. 588, 20 S.Ct. 228, 44 L.Ed. 284; Ripley v. United States, 223 U.S. 695, 32 S.Ct. 352, 56 L.Ed. 614; Penner Installation Corp. v. United States, 89 F.Supp. 545, 116 Ct.Cl. 550, affirmed per curiam by an equally divided court, 340 U.S. 898, 71 S.Ct. 278, 95 L.Ed. 651. See also Merrill-Ruckgaber v. United States, 241 U.S. 387, 36 S.Ct. 662, 60 L.Ed. 1058; Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342, and others. And in several cases this court has held that where a ruling was not supported by substantial evidence, it must be treated as having been arbitrary, capricious, or so grossly erroneous as to imply bad faith, and, therefore, lacking in finality. In Nee-

dles for Use and Benefit of Needles v. United States, 101 Ct.Cl. 535, the court said, at page 607:

> "* * * if the Court is satisfied that no reasonable man could have determined the dispute upon all the relevant facts and data as the administrative officer did, then the court is justified in inferring, as a fact, that the decision was not made impartially or in good faith. If this should not be the process contemplated by the rule that a decision may be set aside if 'so grossly erroneous as to imply bad faith,' it is difficult to see how the rule could ever be consistently and properly applied within the realm of the probable intention of parties to a contract."

See also Penner Installation Corp. v. United States, 89 F.Supp. 545, 116 Ct. Cl. 550, at page 564; Mitchell Canneries, Inc., v. United States, 77 F.Supp. 498, 111 Ct.Cl. 228, 247; Loftis v. United States, 76 F.Supp. 816, 110 Ct.Cl. 551, 630; Bein v. United States, 101 Ct.Cl. 144 (concurring opinion).

Public Law 356, therefore, reinstated the rule applied in this court prior to the Wunderlich decision.

The case at bar was tried before the Wunderlich decision and under the rule applied in this court prior to the Wunderlich decision, but it was argued after that decision.

■ 1. *Cost of completing parts of the cranes at the Philadelphia Navy Yard.*—The contract was awarded plaintiff on the day before the attack on Pearl Harbor, and was actually entered into on December 15, 1941. Defendant was, therefore, in urgent need of the cranes at the earliest possible date. For a number of reasons plaintiff had been unable to complete the contract on time, and, hence, in an effort to expedite the work, defendant ordered the trucks for the cranes and the hoist machinery and rotating mechanism, being manufactured at the plant of one of plaintiff's subcontractors in New York City, to be shipped to the Philadelphia Navy Yard before completion, where the major portion of the cranes were being constructed. Plaintiff says that it cost it considerable additional sums to complete the construction of these portions of the cranes at the Philadelphia Navy Yard, instead of at the plant of the subcontractor in New York City.

Plaintiff's claim therefor has been decided adversely to it by the contracting officer and the head of the department. But plaintiff says the contracting officer's decision is not final because it was a breach of contract for the defendant to have ordered this shift in the situs for doing the work.

It is difficult for us to see how this constituted a breach of contract, but we do not need to decide this question, because it is impossible to determine from the proof the portion of the work which should have been done in the field and the portion which should have been done in the shop; nor is it possible to determine the excess cost of completing at the Philadelphia Navy Yard those portions which should have been completed at the plant of plaintiff's subcontractor. There is, therefore, no reasonable basis to be found in the proof for the fixing of damages, even if this were a breach of contract. Addison Miller, Inc., v. United States, 70 F.Supp. 893, 108 Ct.Cl. 513, 557, certiorari denied 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408.

Plaintiff's claim for these items is disallowed.

2. *Adjustments in the contract price made by the contracting officer as a result of changes in the contract.*—Article 27 of the General Provisions of the specifications related to "Adjustments in price and time owing to changes." It provided for the appointment of a Board to determine the adjustments to be made on account of changes, two members of which should be representatives of the Government, and one member a representative of the plaintiff. The findings of this Board were subject to approval of the contracting officer, whose deci-

sion was made final, subject to appeal to the head of the department.

The majority of this Board recommended a reduction in the amount to be paid plaintiff as the result of savings effected by changes, and for the cost of completing the contract after its termination, in the total amount of $43,994.00. Plaintiff's representative submitted a minority report recommending an increase in the contract price of $67,271.82, instead of the reduction recommended by the majority. The contracting officer decided the contract price should be reduced by $34,120.00, subject to a credit of the sum of $4,993.20 for overtime plaintiff was required to pay its laborers at the demand of the Government, and on its promise to reimburse plaintiff therefor. The result of his determination was that the contract price should be reduced by the amount of $29,126.80. This was affirmed on appeal.

The contract price, as amended by change orders, amounted to $278,192.13. If this amount is to be reduced by the amount found by the contracting officer, $29,126.80, there would have been due plaintiff a balance of $249,065.33. Plaintiff has been paid $248,378.31, leaving a balance due, according to the contracting officer's figures, of $687.02, which plaintiff is, confessedly, entitled to recover.

■ We are of the opinion, however, that the contracting officer's decision on some of the items going to make up the total of $29,126.80 is not final, and is incorrect, for the reasons to be stated. These items follow. They will be given the same designation as they were given in the report of the Board on Changes.

Item (a). *Additional 1-inch cables*. —The contracting officer proposed a reduction in plaintiff's contract price of $407.00, for the purchase and installation of new main hoist cables 1 inch in diameter. Defendant concedes that this reduction in contract price was unwarranted. The facts show that plaintiff, over a year after the acceptance of the cranes, furnished two reels of 1-inch cable for replacement of the main hoist cables on the two cranes, at a total cost of $825.61. Defendant also concedes that plaintiff is entitled to an increase in contract price in this amount for this item. Plaintiff, therefore, on this item may recover $1,232.61.

Item (b). *Gear reduction units.*— The specifications called for the installation of gear reduction units between the power plants and the parts to be operated thereby, in order to reduce speed and increase power. Upon inquiry plaintiff learned that such units could not be delivered to it by the manufacturers thereof before 8 to 12 months. Plaintiff accordingly suggested to the contracting officer that he authorize the substitution of a spur gear reduction assembly as designed in its drawing M–11, instead of the gear reduction units specified. This was authorized, and the substituted spur gear reduction assembly was installed.

The Board on Changes found that the contract price should be reduced by the amount of $3,267.00 on account of this substitution, which amount the contracting officer reduced to $2,970.00. On the other hand, the Commissioner of this court has found that instead of the reduction in contract price, there should have been an increase therein of the amount of $2,109.48 as a result of the substitution.

We have carefully considered the Commissioner's finding and have adopted it, with a slight modification, as the finding of the court.

The gear reduction units called for by the specifications were precision made as complete and individually housed assemblies, designed to deliver the percentage of reductions specified to produce the required strength and load capacity. They were shop finished units, manufactured and assembled complete, and ready for installation. The installation of them would have been comparatively simple, since they required connections only at points of reception and output of power.

On the other hand, the open spur gear assembly had to be designed by plaintiff, and was designed by it in accordance with its drawing M–11. This required designing the integral parts of the assembly and required field adjustments and alignments of it. The installation of such an assembly was, therefore, more expensive than the installation of a preassembled unit, which merely required connection at the intake and output of power.

Paragraph 27 of the general provisions of the specifications required that:

"* * * In determining the change in price the cost of additions shall be the estimated actual cost to the contractor and the cost of deductions shall be the estimated cost to the contractor as of the time when the contract was made. In arriving at the amount of the change, due allowance shall be made in the discretion of the contracting officer for overhead and general expense, plant charges, and other expense items of a similar nature. To all estimates of cost 10 percent shall be added for contractor's profit. In determining the cost of changes, social security taxes (without overhead, bond or profit thereon) will be included as an item of the cost."

Thus the contracting officer was under the obligation of ascertaining the "estimated actual cost to the contractor" of the spur gear assembly, and of adding this cost to the contract price, and then deducting from the contract price "the estimated cost to the contractor as of the time when the contract was made" of the gear assembly units which were not installed.

The Board on Changes directed one Robert B. Burke, defendant's estimator, to determine the amount to be added or deducted from the contract price on account of the substitution of the spur gear assemblies for the gear reduction units. This man asked the Falk Corporation what the gear reduction units, which were discarded, would cost. This corporation advised him they would cost $6,480. He then asked a mechanical engineer for another corporation, the Dry Docks Associates, what it would cost plaintiff to install the spur gear assembly. This man told him that it should cost $3,800 for the two cranes. Burke took the difference between $6,480 and $3,800 as a saving to the plaintiff. To this deduction he added a 10 percent saving in overhead expense, 10 percent for profit, and 0.75 percent as the reduction in bond premium, and came up with the figure of $3,267, which he said the plaintiff would save by reason of the substitution. The Board adopted this, and also the contracting officer and the head of the department, after eliminating the profit.

It is obvious that the figures furnished Burke by these two corporations were merely guesses. Burke had no plan for the gear reduction unit which was discarded, and prepared none for the Falk Corporation in order that they could make an intelligent estimate; nor was drawing M–11, which had been prepared by plaintiff for the spur gear assembly, furnished to the Dry Docks Associates, nor any other specifications therefor; nor did Burke advise these people of the size or nature of the materials to be used in the spur gear assembly, nor the sizes or nature of the materials used in the gear reduction unit for which the spur gear assembly was substituted.

In short, neither one of these corporations was furnished the information necessary for them to make an intelligent estimate. The figures they furnished plaintiff were no more than rough guesses. It is indeed surprising that they would be willing to make any estimate, considering the paucity of information upon which to base it.

Whereas this estimator found that the plaintiff would save $3,267 on account of this substitution, the Commissioner of this court has found that it would cost plaintiff an additional amount of $2,109.48 to make the substitution.

We think the finding of the contracting officer, affirmed on appeal by the

head of the department, on this item was no more supported by substantial evidence than the offhand guess of an architect as to what it is going to cost to build a home. Not only do we think his decision on this item is not supported by substantial evidence, we think it closely approaches being capricious, and so grossly erroneous as to show recklessness, if not to imply bad faith.

Item (c). *Conical rollers.*—Here, too, we think the decision of the contracting officer is not supported by substantial evidence.

The specifications provided that the revolving section of the crane consisting of the machinery house, boom, and other operating equipment would be mounted upon a frame which could be rotated in a complete circle. The means provided for by the specifications for rotating this upper section consisted of upper and lower heavy steel circular castings or rails with surfaces machined to a conical shape, known as the roller path. Conical rollers were to be provided between the upper and lower rails as bearings upon which the upper section could be rotated in a circular motion. The rollers were to be held in place by a rigid cage having radial members centered around the kingpin, similar to spokes in a wheel, known as the spider. The roller path formed a complete circle approximately 25 feet in diameter.

It required a very large mill to machine the surfaces of the roller path to a conical shape to fit the conical roller bearings. It developed that such a milling machine was not available to do this. Whereupon, defendant's chief designer, a Mr. Wagstaff, suggested a change in the rotating mechanism from roller bearings and roller path to 175-pound rails and wheels with toughened rims and flanges to fit between the rails.

Accordingly, plaintiff submitted drawings M–13 and M–14 for the roller cage assembly and rotating mechanism, showing designs for 175-pound Lorain circular rails 25 feet in diameter, similar to the size used for railroad tracks, and 36 flanged wheels 14 inches high to carry the revolving super-structures. As revised, the drawings called for wheels to be flanged on opposite sides of the rails on alternate wheels. The rails were bolted to the upper revolving frame and the lower stationary frame upon a ¾-inch steel plate, with bolts 1 inch in diameter. This mechanism was substituted for the conical roller mechanism.

The Board on Changes adopted the report of defendant's chief estimator, in which he found that the contract price should be reduced by the amount of $11,215 on account of the substitution of these rails and wheels for the conical rollers and roller path originally specified. The contracting officer eliminated the 10 percent profit reduction included in the report of the Board on Changes, but found that the Government was entitled to a credit of $10,196 on account of this substitution.

As in the case of the gear reduction units, the Board on Changes and the contracting officer and head of the department relied upon the report of the defendant's chief estimator Robert B. Burke. This man, however, had no knowledge of plaintiff's actual cost for the rotating mechanism actually installed in the cranes. He made no calculations of comparative cost between the conical rollers and roller path and the rails and wheels actually installed, and did not even know that the rims and flanges of the wheels were toughened steel. This estimator got estimates from the Dravo Corporation, and again from Mr. Keene, the mechanical engineer of Dry Docks Associates. Mr. Keene estimated that the conical rollers and roller path would have cost plaintiff $2,830 per crane, and that the flanged wheels and rails would have cost it $1,290, or a saving of $1,540 per crane. The Dravo Corporation, on the other hand, estimated plaintiff would save the sum of $6,000 per crane by the use of flanged wheels and rails. Burke took these figures and arrived at what he calls a "weighted average" of $4,600 on each crane, or a total saving of $9,200. To this sum he added 10 percent for over-

head, and 10 percent for profit, and 0.75 percent for bond premium, making a total of $11,215.49, which the contracting officer reduced to $10,196.

Here again, neither the Dravo Corporation nor the Dry Docks Associates was furnished the original plan for the conical rollers and roller path, nor were they furnished drawings M–13 and M–14 designed by the plaintiff for the flanged wheels and rails. No details were given them of weights of the materials to be used or the prices of material.

The Commissioner of this court has found that it actually cost plaintiff $3,844.46 more to install these rails and wheels than it would have cost it to have installed the conical rollers and roller path. We think the Commissioner's finding is justified and we have adopted it as a finding of the court. Therefore, instead of the defendant being entitled to a reduction in the contract price of $10,196, we think plaintiff is entitled to an addition to it in the amount of $3,844.46.

Here again we think the contracting officer's finding was nothing more than a rough guess and was not supported by substantial evidence, and that it approaches being capricious and grossly erroneous.

Item (d). *Cost of completion after termination.*—This will be dealt with later after further consideration of the adjustments made on account of changes.

Item (e). *Cost of installing bronze bushings, $1,773.00.*—At the hearing the defendant conceded that the plaintiff should not have been charged with this item and that it is entitled to recover it.

■ Item (f). *Ratchet locking devices.*—The contracting officer required the installation of mechanical ratchet locking devices on the boom hoists of both cranes, claiming that they were required by the specifications. Plaintiff insists they were not so required. A decision involving a construction of the specifications is not binding on us because not a finding of fact, the disputes clause, according finality to the findings

of the contracting officer, being limited to findings of fact. Farwell, Inc., v. United States, 115 F.Supp. 477, 126 Ct. Cl. 317.

The provisions of the specifications relied upon by the contracting officer as requiring a ratchet locking device read as follows:

"2–05.3 (b) *Luffing mechanisms* shall be arranged so that the position of the jibs can change only when the mechanism is in operation. The mechanisms shall be capable of luffing the loaded jobs [jibs] between the specified radii in the time specified and shall each consist of a motor, flexible coupling, reduction gear unit, drum gear and pinion, drum, automatic electric brake, and mechanical brake, all mounted on a common bedplate. The jibs shall be capable of being lowered to a horizontal position.

"2–09. *Mechanical brakes, locking devices, radius indicator, and fire extinguisher.*—Mechanical brakes of the hydraulically operated type shall be provided for the hoisting and luffing mechanisms. \* \* \*"

The contracting officer did not furnish bidders detailed drawings when inviting bids. Instead, the successful bidder was required to submit his own drawings for approval. After the contract was let to plaintiff, it submitted its drawing M–11, which provided for a hydraulically operated brake on the hoist and luffing mechanisms, and for an automatic electric brake on the shaft of the motor. The jib was under control of the motor at all times while in operation and could be lowered to the ground. The brake could not be disengaged except electrically. No ratchet locking device was provided on the plan nor installed by the plaintiff. This drawing was approved by the contracting officer on July 4, 1942.

Since drawing M–11 was one made pursuant to the above-quoted articles of the specifications, and since it provided for no ratchet locking device, and since it was approved by the contract-

ing officer, it cannot be said that a ratchet locking device was called for by the specifications. A reading of the specifications certainly does not indicate that it is called for.

Furthermore, the Government representatives never mentioned a ratchet locking device until February 15, 1943, some 15 months after work on the cranes had been started and 10 days before plaintiff's right to proceed was terminated.

There was no justification for reducing the contract price by this item, and plaintiff is entitled to recover the sum of $1,718.00 on account of this item.

Item (g). *Swivel hooks.*—Plaintiff's drawing No. 8 provided for a plain, single prong hook on the main hoist of both cranes. This drawing was submitted for approval by plaintiff on January 20, 1942, and was finally approved on January 11, 1943. Prior to approval and prior to installation plaintiff wrote defendant on May 8, 1942, as follows:

"We are ordering two 30-ton capacity hooks to be attached to the blocks of the main hoist and two 10-ton hooks for the auxiliary hoist, for the two 20-ton whirler cranes for Philadelphia.

"We understand our contract calls for plain hooks. Please advise promptly if we are correct in this."

The Chief of the Bureau of Yards and Docks replied on May 13, 1942, as follows:

"In reply to your letter, reference (a), the Bureau advises that single-barbed hooks will be required for the blocks of the main and auxiliary hoists for the subject cranes."

There was, therefore, no justification for charging plaintiff for the installation of the dual pronged swivel hooks in lieu of the plain single pronged hook which had been previously installed.

Plaintiff is, therefore, entitled to recover the sum of $1,607.00, by which amount its contract price was reduced to cover the cost of the installation of these dual pronged swivel hooks.

Item (h). *Lubrite thrust washers.*—Plaintiff in its drawing M–13 had provided for plain bronze washers at the hubs of the roller cage wheels and for lubrication of them, which was approved by the defendant. Later, the defendant decided to experiment with lubrite bearings. The theory of lubrite lubrication is that the antifriction powder of the lubrite bearings would be deposited upon the pins on which the wheels turned and would be carried out to the side or hub area for adequate lubrication of the thrust washers. Lubrite washers were not specified or required in the change from plain bronze bushings to lubrite bushings, nor did the defendant ever install lubrite washers. The reduction in the contract price of $1,277.00 is a mere estimate of what it would have cost the defendant to have installed these lubrite washers had it decided to do so. There is no justification whatever for reducing the contract price by this amount, and plaintiff is entitled to recover $1,277.00, by which amount the contract price was reduced on account of this item.

Item (i). *Guards and track brushes.*—It is conceded that this item was called for by the specifications and was not installed by plaintiff. It was, therefore, proper to reduce the contract price by the cost of the installation of them, which was found by the contracting officer to be $743.00.

Item (j). *Searchlight handles.*—The plaintiff's contract price was reduced by the sum of $33.00 for the installation of an extension to the searchlight handle on both cranes. The specifications do not designate the length of the handle required on the flood lights. The plaintiff provided 3-foot handles. On demand of the contracting officer for an extension of the length of these handles, plaintiff purchased 6-foot handles and shipped them to the defendant, with the request that the old 3-foot handles be returned to it. There is no evidence that the new handles were installed or that the old handles were ever returned.

Since plaintiff furnished the handles demanded, there seems to be no justification for this reduction in the contract price.

Item (k). *Replace broken gauge.*— The only thing broken about this gauge was the glass cover. This was broken after defendant had terminated plaintiff's right to proceed and while another contractor was completing the contract. No justification for charging plaintiff with the cost of replacing this glass cover appears, and plaintiff is entitled to recover $19.00 on account of this item.

Items (l) and (m).—The Board on Changes proposed to reduce the amount payable to the plaintiff by the amount of these items, but it was reversed by the contracting officer, and the contract price was not reduced by the amount of them.

Item (n). *Guards over main hook sheaves.*—These guards were called for by the specifications and were not installed by plaintiff and, therefore, the contract price should have been reduced by the cost of installing them, found by the contracting officer to be $55.00.

3. *Cost of completion.*—As heretofore stated, the date for the completion of this contract was June 3, 1942. Much delay was encountered, however, due to the difficulty of obtaining materials and other things, so that on February 25, 1943, the work was still incomplete. On that date the defendant terminated plaintiff's right to proceed and entered into a contract with three firms, operating as Dry Docks Associates, to complete the work. The work was completed by them at a cost of $14,718.38, paid to Dry Docks Associates, and at an additional cost to the Government of $1,690.00 for the use of Navy Yard cranes in completing the work.

The contract was terminated "for the convenience of the Government." Defendant does not seek to charge plaintiff with any excess cost, but it does assert the right to deduct from plaintiff's contract price what it cost the Government to complete the work. This cost is alleged to have been $13,322.00.

The Government, of course, is entitled to deduct from the contract price whatever it cost it to complete the work. Plaintiff does not dispute this, but does claim that a number of the items included in the Government's statement of the cost of completion were improper items.

Here again the Government asserts the finality of the decision of the contracting officer, affirmed on appeal. What was the actual cost of completion is of course a question of fact, and the contracting officer has determined that fact by finding that the cost was $13,322.00. While we think some of the items are questionable, and that the amounts of them have been arrived at in a very casual sort of way, we find from our review of the facts that it actually did cost the defendant as much as, or more than $13,322.00 to complete the contract work.

The defendant was, therefore, justified in reducing the contract price by this amount. This amount, by the way, goes to make up the total of $29,126.80, by which the contracting officer reduced the contract price.

The full facts relative to the cost for completion of the work is set forth in our findings 48 to 57, both inclusive.

To summarize, the contracting officer made unauthorized reductions in the contract price of the following amounts, which plaintiff is entitled to recover.

(1) $687.02, amount due plaintiff, even conceding the correctness of the total reduction in the contract price of $29,126.80 made by the contracting officer;

(2) $2,970 on account of the substitution of the spur gear assembly for the gear reduction units;

(3) $10,196 on account of the substitution of rails and wheels for the conical rollers and roller path;

(4) $1,232.61 on account of the additional 1-inch cables, which was withdrawn at the trial;

(5) $1,773.00, the cost of installing bronze bushings in the jib hinge pins, which was conceded by the defendant at the trial;

(6) $1,718.00, deduction for ratchet locking devices;

(7) $1,607.00, deduction for dual pronged swivel hooks;

(8) $1,277.00, deduction for lubrite washers;

(9) $33.00, deduction for extension to handles for flood lights;

(10) $19.00, deduction to replace a broken glass on a gauge.

Thus the contracting officer erroneously reduced the contract price by the sum of $21,512.63, which amount plaintiff is entitled to recover, and plaintiff is also entitled to recover the excess cost of the substitution of the spur gear assembly for the gear reduction unit in the amount of $2,109.48, and for the substitution of the steel rails and wheels for the conical rollers and roller path in the amount of $3,844.46, or a total of $5,953.94.

Plaintiff is, therefore, entitled to recover the total sum of $27,466.57.

■ 4. *Counterclaim—Cost to defendant of correcting allegedly defective work.*—Defendant's counterclaim for the cost of correcting allegedly defective work is without merit. The petition was filed on June 18, 1947. Testimony was taken during 1949 to 1951. It was not until July 1950 that the defendant filed its counterclaim, more than three years after the petition was filed. This counterclaim was amended in December 1950.

No defect in the operation of the cranes had been asserted prior to the filing of a counterclaim, except a request from the assistant public works officer, for plaintiff to remit the sum of $485.00 to cover some little items due principally to the failure of the lubrite bearings which had been substituted by the defendant for the bearings called for by the original contract. No other defect in the operation of the cranes was ever asserted until the filing of the counterclaim. It is plainly an afterthought, which we do not think merits detailed discussion in this opinion. The facts, however, are set out in findings 68 to 80, both inclusive.

On the whole case, plaintiff is entitled to recover from the defendant the sum of $27,466.57 for which judgment will be entered.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.

LARAMORE, Judge, took no part in the consideration or decision of this case.